**Luther MILLER et al., Plaintiffs-Appellants,**

v.

**James Y. CARTER, Defendant-Appellee.**

**No. 75–1162.**

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1975.

Decided Jan. 4, 1977.

Howard Eglit, Robert Masur, Nancy Preston, Jerome J. Robert, Chicago, Ill., for plaintiffs-appellants.

William R. Quinlan, Acting Corp. Counsel, Robert R. Retke, Asst. Corp. Counsel, Chicago, Ill., for defendant-appellee.

Before TONE and BAUER, Circuit Judges, and CAMPBELL, Senior District Judge.*

PER CURIAM.

The issue before us is whether a Chicago ordinance which permanently bars persons convicted of certain offenses from obtaining a public chauffeur's license violates the due process and equal protection clauses of the Fourteenth Amendment. The District Court sustained the ordinance. We reverse.

Plaintiff was convicted of armed robbery in 1965, when he was 20 years old, and, after serving seven years in the Illinois State Penitentiary, was paroled in 1972. He satisfactorily completed his parole and was discharged in August 1973. In September 1974 he applied for a public chauffeur's license to qualify for employment as a taxicab driver. His application was refused on the ground of Chicago Municipal Ordinance, Ch. 28.1–3, which provides that such a license may not

> "be issued to any person at any time after conviction of a crime involving the use of a deadly weapon, traffic in narcotic drugs, the infamous crime against nature, incest or rape."

Plaintiff thereupon filed this action for injunctive and declaratory relief. The motion of the defendant, the city's Public Vehicle License Commissioner, to dismiss the complaint was granted by the District Court, and judgment was entered in his favor.

Chapter 28.1–2 of the Chicago Municipal Ordinance requires that any person employed in "transporting . . . passengers for hire" have a public chauffeur's license. Applications for the license are made to the commissioner, who submits the name of an applicant to the captain of the police district in which the applicant resides for a "character and reputation" investigation. Ch. 28.1–4. After receiving the police captain's report, the commissioner rules on the application:

> "If the commissioner shall be satisfied that the applicant is of good character and reputation and is a suitable person to be entrusted with driving a public passenger vehicle he shall issue the license." Ch. 28.1–4.

The commissioner is prohibited, however, as we have seen, from issuing a license to any person convicted of certain crimes, including the one of which plaintiff was convicted. Persons convicted of felonies not listed in the passage quoted above, and of other crimes involving moral turpitude, are ineligible to apply for licenses for a period of eight years following conviction. Ch. 28.1–3.

In *Freitag v. Carter*, 489 F.2d 1377 (7th Cir. 1973), this court held unconstitutional the Public Vehicle License Commissioner's denial of an application for a public chauffeur's license under a clause of Ch. 28.1–3 which prevented the issuance of a license to any applicant "subject to . . . infirmity of . . . mind . . . which may render him unfit to drive a public passenger vehicle." We held that the due process clause of the Fourteenth Amendment required that a "governmental licensing body which judges the fitness of an applicant must afford that applicant adequate notice and a hearing." *Id.*, 489 F.2d at 1382. Such a hearing on plaintiff Luther Miller's application, however, would be a mere formality because of the prohibition in Ch. 28.1–3 against granting a license to one who has committed a crime involving the use of a deadly weapon.

---

* The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

In addition to the provisions previously discussed, the ordinance specifies standards of conduct required of licensees and sets penalties for violations of those standards. Ch. 28.1–10 through 28.1–15. Ch. 28.1–10 describes, as conduct which can lead to the revocation of a license, the violation of "any criminal law which, if convicted for such offense, would disqualify any applicant for a chauffeur's license . . . ." Engaging in this behavior does not, however, lead to automatic revocation. Rather, "the commissioner *may* recommend to the mayor that [the] license . . . be revoked and the mayor, *in his discretion, may* revoke such license." (Emphasis supplied.) Thus, plaintiff Miller is absolutely barred from obtaining a license, although he was convicted of armed robbery over eleven years ago, while someone who already holds a license may be permitted to retain it, although convicted of armed robbery only yesterday.

The city's purported justification for this different treatment of persons who commit one of the listed offenses after receiving a license is that they have a "track record" that the commissioner and mayor can balance against the felony in evaluating fitness. The validity of this distinction is dissipated, however, by the fact that a licensee has an opportunity to obtain a favorable exercise of this discretion regardless of how short a time the license has been held. Thus, one who committed armed robbery within a few days of receiving the license, or one who committed the crime before licensing but was convicted after receiving the license, would, apparently, be eligible to retain the license. Indeed, one who was convicted of armed robbery before applying, but concealed that fact and so obtained a license, would, according to the ordinance, also be eligible to retain the license, for

under Ch. 28.1–10 misrepresentation or omission of a material fact in the application, like commission of one of the prohibited offenses while licensed, does not automatically result in revocation.

Such distinctions among those members of the class of ex-offenders are irrational, regardless of the importance of the public safety considerations underlying the statute or the relevance of prior convictions to fitness. In fact, allowing existing licensees who commit felonies to continue to be eligible for licensing undercuts the reasonableness of the basis for the classification, which is that the felony is *per se* likely to create a serious risk which cannot be sufficiently evaluated to protect the public through individualized hearings. An applicant for a license who has committed one of the described felonies and a licensee who has done the same are similarly situated, and no justification exists for automatically disqualifying one and not the other. Accordingly, insofar as Ch. 28.1–3 and 28.1–10 discriminate irrationally among the class of ex-offenders, they violate the equal protection clause of the Fourteenth Amendment.

Plaintiff has also argued that the challenged ordinance violates the due process clause because it creates an irrebuttable presumption that a person convicted of a specified offense is forever unfit to be entrusted with a public chauffeur's license. Judge Campbell, who files a separate opinion concurring in the result, would decide the case on this ground, because of his concern that the equal-protection deficiency in the ordinance can readily be remedied by the city, and, if it is, we will soon be faced with another case raising the due process issue. We cannot predict whether the city will amend the ordinance to retain an absolute bar to employment as a public chauffeur which it has not seen fit to apply to any other occupation, no matter how sensitive.[1] In any event, the equal-protection

---

1. Briefs filed by *amici curiae* (Illinois Department of Corrections, Operation Dare, Just Jobs, Chicago Council of Lawyers, and John Howard Association) urge that the policy of absolute preclusion is inconsistent with state-imposed qualifications for other more sensitive occupations, fails to take account of experience showing the possibility of rehabilitation, is unnecessary for the protection of the public, and removes from the limited number of employment opportunities realistically available to ex-offenders that of taxicab or bus driver. While we are not unsympathetic to these public-policy arguments, they are more appropriately addressed to the legislative branch and can be

ground disposes of the case before us, and we are unwilling to plunge unnecessarily into the thicket of irrebuttable presumptions, for reasons which we can summarize as follows.

The irrebuttable presumption doctrine, invoked by the Supreme Court in several recent cases,[2] has its roots in the era when substantive due process concepts led the Court to strike down state and federal economic and social legislation it deemed arbitrary or capricious.[3] The renaissance of the doctrine has been fatal to state laws regulating residency for purposes of voting rights[4] and college tuition,[5] driver's license

suspension,[6] child custody,[7] and pregnancy disability.[8] Federal regulations concerning food stamp eligibility were also held unconstitutional on the same rationale.[9] In all these cases the legislative classifications were judged by balancing the advantages and feasibility of individualized determinations against the inflexibility and consequent harshness of the classification. In each case the Court struck down the classification established, and required an individualized factual determination of the eligibility of the plaintiff for the benefits or penalties attendant upon membership in the class. It did not, however, forbid considera-

when consideration is given to amending the ordinance we hold invalid.

2. *Turner v. Department of Employment Security,* 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *United States Department of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Cf. *Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974). Two previous decisions, *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), and *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), have been explained as resting, at least in part, upon the same rationale. *Stanley v. Illinois, supra,* 405 U.S. at 653–656, 92 S.Ct. 1208.

3. In *Schlesinger v. Wisconsin,* 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926), the Court, per Mr. Justice McReynolds, held a Wisconsin estate tax statute unconstitutional, because its provision that all transfers for less than adequate consideration made within six years of death be deemed gifts in contemplation of death violated the due process and equal protection clauses, in that gifts "in fact made without contemplation [of death] are . . . conclusively presumed to have been so made without regard to actualities, while like gifts at other times are not thus treated." 270 U.S. at 240, 46 S.Ct. at 261. In *Heiner v. Donnan,* 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932), the Court, per Mr. Justice Sutherland, overturned a similar federal estate tax provision as "so arbitrary and capricious as to cause it to fall before the due process of law clause of the Fifth Amendment . . . ." 285 U.S. at 326, 52 S.Ct. at 361. This was so because "the presumption here created . . . is made definitely conclusive—incapable of being overcome by proof of the most positive character." 285 U.S. at 324, 52 S.Ct. at 360. In both cases the

Court referred to earlier decisions discussing the due process implications of conclusive evidentiary presumptions. *Bailey v. Alabama,* 211 U.S. 452, 29 S.Ct. 141, 53 L.Ed. 278 (1908); *Bailey v. Alabama,* 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1911); *Keller v. United States,* 213 U.S. 138, 29 S.Ct. 470, 53 L.Ed. 737 (1909); and *Mobile, J. & K. C. R. Co. v. Turnipseed,* 219 U.S. 35, 31 S.Ct. 136, 55 L.Ed. 78 (1910).

4. *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

5. *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973).

6. *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

7. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

8. *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Turner v. Department of Employment Security,* 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975).

9. *United States Department of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973). The doctrine may also have been the basis, in part at least, for the Court's decision in *Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974). Although the Chief Justice authored that opinion, and has been critical of the irrebuttable presumption doctrine, the Court's discussion at 417 U.S. 636–638, 94 S.Ct. 2496 certainly echoes the earlier cases. In fact, Mr. Justice Blackmun's opinion for the Court in *Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), distinguishes *Jimenez* as involving conclusive presumptions. 427 U.S. at 511, 96 S.Ct. at 2765.

tion of the factors behind the classification in making that determination.[10]

The irrebuttable presumption analysis has been criticized from its inception.[11] Mr. Justice Holmes pointed out that the creation of a conclusive presumption is simply an enactment of a rule of substantive law.[12] The Court's more recent invocations of the doctrine have been criticized within[13] and without[14] the Court.

While *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), authored by Mr. Justice Rehnquist, might be viewed as a major step back from the doctrine,[15] we cannot say that the doctrine has lost the support of a majority of the Court

because it has been invoked subsequent to *Salfi* to strike down a Utah statute, *Turner v. Department of Employment Security*, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975), and to distinguish in *Mathews v. Lucas*, 427 U.S. 495, 511, 96 S.Ct. 2755, 2765, 49 L.Ed.2d 651 (1976), the earlier *Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974). Yet in sustaining a state compulsory-retirement-for-age statute in *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), last June, the Court made no reference to the doctrine.[16]

In summary, we cannot say whether the irrebuttable presumption doctrine or the substitute analysis followed in *Salfi*[17]

**10.** See *Vlandis v. Kline*, 412 U.S. 441, 452–454, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), and *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 647 nn. 13 & 14, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974).

**11.** See Mr. Justice Holmes' dissent in *Schlesinger v. Wisconsin, supra*, 270 U.S. at 241, 46 S.Ct. 260, and Mr. Justice Stone's dissent in *Heiner v. Donnan, supra*, 285 U.S. at 332, 52 S.Ct. 358.

**12.** *Keller v. United States*, 213 U.S. 138, 149, 29 S.Ct. 470, 53 L.Ed. 737 (1909) (dissent); *Bailey v. Alabama*, 219 U.S. 219, 245, 31 S.Ct. 145, 55 L.Ed. 191 (1911) (dissent).

**13.** Mr. Justice Rehnquist has characterized the doctrine as relying "heavily on notions of substantive due process that have been authoritatively repudiated," *Vlandis v. Kline, supra*, 412 U.S. at 463, 93 S.Ct. at 2242, and as "in the last analysis nothing less than an attack upon the very notion of lawmaking itself." *Cleveland Board of Education v. LaFleur, supra*, 414 U.S. at 660, 94 S.Ct. at 806. The Chief Justice has criticized the doctrine since *Stanley v. Illinois*, 405 U.S. 645, 662, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and Mr. Justice Powell expressed concern "about the implications of the doctrine for the traditional legislative power to operate by classification." *Cleveland Board of Education v. LaFleur, supra*, 414 U.S. at 652, 94 S.Ct. at 802 (concurring opinion).

**14.** See Bezanson, *Some Thoughts on the Emerging Irrebuttable Presumption Doctrine*, 7 Ind.L.Rev. 644 (1974); Note, *The Irrebuttable Presumption Doctrine in the Supreme Court*, 87 Harv.L.Rev. 1534 (1974); Note, *The Conclusive Presumption Doctrine: Equal Process or Due Protection?*, 72 Mich.L.Rev. 800 (1974); Note, *Irrebuttable Presumptions: An Illusory Analysis*, 27 Stan.L.Rev. 449 (1975). But see Simson, *The Conclusive Presumption Cases: The Search For A Newer Equal Protection Con-*

tinues, 24 Cath.L.Rev. 217 (1975). Besides pointing out that few, if any, legislative classifications would survive the consistent application of the doctrine, the commentators have complained that the Court has never explained what prompted it to invoke the doctrine in some cases but not in others.

**15.** It was said that, if extended, the irrebuttable presumption doctrine of the prior cases could become

"a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution." 422 U.S. at 772, 95 S.Ct. at 2470.

**16.** An omission which is particularly striking in light of Mr. Justice Rehnquist's dissent in *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 659, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), adverting specifically to the effect of the irrebuttable presumption doctrine on mandatory retirement statutes.

**17.** "The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded *both* that a particular limitation or qualification would protect against its occurrence, *and* that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule." 422 U.S. at 777, 95 S.Ct. at 2472. (Emphasis supplied.) This approach to the problem of individual fairness when the legislature operates by classification appears to be consistent with the emphasis in *Vlandis v. Kline*, 412 U.S. 441, 452–454, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63 (1973), upon the "reasonable alternative means of making the crucial determination" available to Connecticut. Cf. *Dean Milk Co. v. City of Madison, Wisconsin*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951).

would be thought appropriate for this case by a majority of the Supreme Court. Inasmuch as our equal-protection holding decides the case, it is unnecessary to reach the more difficult due process question.

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

WILLIAM J. CAMPBELL, Senior District Judge, concurring.

Plaintiff's complaint challenged the constitutionality of Ch. 28.1–3 and defendant's conduct pursuant thereto, contending that the ordinance "deprives persons of a right to employment and to earn a living without due process of law", in violation of the Due Process Clause of the Fourteenth Amendment, and that it "singles out a class of persons for denial of access to a governmentally-established prerequisite to employment by denying public chauffeur's licenses to persons convicted of certain crimes," in violation of the Equal Protection Clause of the Fourteenth Amendment.

The District Court granted defendant's motion to dismiss on the ground that there existed a rational relationship between the classification (persons convicted of a crime involving the use of a deadly weapon) and the goal which the ordinance seeks to achieve (the protection of the public). Accordingly, the court held that the ordinance did not violate the Equal Protection Clause. In addition, the court held that the automatic exclusion of all persons convicted of a crime involving the use of a deadly weapon did not violate the Due Process Clause, holding that the "test of the appropriateness of the classification is whether it has a reasonable relationship to the goals sought to be attained."

On appeal, plaintiff contends that the ordinance creates an irrebuttable presumption of unfitness, barring issuance of a chauffeur's license irrespective of evidence to the contrary and thus deprives him of any opportunity for a meaningful hearing. He also contends that the ordinance violates the Equal Protection Clause of the Four-

teenth Amendment in two respects: (1) that the ordinance unconstitutionally discriminates against applicants previously convicted of a crime involving use of a deadly weapon, as against all other persons; and (2) that the distinction in treatment afforded ex-offender applicants, on the one hand, and licensees convicted of such offenses subsequent to issuance of the license, on the other, is irrational. The majority would resolve this appeal solely on the basis of plaintiff's second equal protection argument, holding that:

"Such distinctions among those members of the class of ex-offenders are irrational, regardless of the importance of the public safety considerations underlying the statute or the relevance of prior convictions to fitness. In fact, allowing existing licensees who commit felonies to continue to be eligible for licensing undercuts the reasonableness of the basis for the classification, which is that the felony is *per se* likely to create a serious risk which cannot be sufficiently evaluated to protect the public through individualized hearings. An applicant for a license who has committed one of the described felonies and a licensee who has done the same are similarly situated, and no justification exists for automatically disqualifying one and not the other. Accordingly, insofar as Ch. 28.1–3 and 28.1–10 discriminate irrationally among the class of ex-offenders, they violate the equal protection clause of the Fourteenth Amendment."

While I agree fully with this conclusion, I respectfully suggest that the remaining contentions advanced by plaintiff should also be addressed and resolved by this Court. If the only constitutional deficiency of this ordinance were the fact that it irrationally distinguishes between certain ex-offender applicants and those who are convicted of certain crimes subsequent to the issuance of a license (affording the latter, but not the former, an opportunity for a meaningful hearing), that deficiency easily could be cured by amending the ordinance so as to provide for the automatic revocation of any license held by a person who, subsequent to issuance thereof, is convicted

of certain felony offenses. Upon passage of such an amendment and the continued refusal to afford this plaintiff a *meaningful* hearing (i. e., one at which the result is not preordained by an irrebuttable presumption of unfitness), I would anticipate Mr. Miller's return to the district court to challenge the constitutionality of the ordinance on the remaining grounds heretofore advanced in the district court and again on appeal. In view of the realistic possibility that this would occur, and in the interest of avoiding unnecessary litigation, I believe the due process issue, as well as the remaining equal protection issue, should be resolved at this time.

## EQUAL PROTECTION

Plaintiff argues that the ordinance, on its face, discriminates against one group of persons—those previously convicted of a crime involving the use of a deadly weapon—as against all other persons and as against other ex-offenders.[1]

In order to assess this aspect of plaintiff's equal protection claim, it is of course necessary first to determine the appropriate standard by which the constitutionality of the ordinance should be measured. Plaintiff urges that his right to work is such a fundamental right that the classification provided for in the ordinance should be tested against a constitutional standard of "strict scrutiny," and upheld only if found to be necessary to promote a compelling governmental interest. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The defendant, on the other hand, argues that the legislative classification under consideration does not interfere with the exercise of any fundamental rights, and should be measured against the test of rationality set forth in *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), wherein the Court held that "the Equal Protection Clause does not require that a State must choose between

attacking every aspect of a problem or not attacking the problem at all . . . It is enough that the State's action be rationally based and free from invidious discrimination." 397 U.S. at 486–487, 90 S.Ct. at 1162.

The strict scrutiny test, requiring that a legislative classification be upheld only if it is necessary to advance a compelling state interest, will be used to measure the constitutionality of a legislative classification "only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520, 524 (1976); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Included among such fundamental rights are those protected by the First Amendment, such as the right of individuals to associate for the advancement of political beliefs, *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), and at least to some extent the right of personal privacy, *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Also viewed as "fundamental" are the right to vote, *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) and the right of interstate travel, *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). I am not persuaded, however, that the right to employment in a particular field of endeavor is "fundamental" in a sense which requires application of the strict scrutiny rule. Of particular note is the Supreme Court's recent decision in *Massachusetts Board of Retirement v. Murgia*, supra, wherein the Court found "no support to the proposition that a right of governmental employment *per se* is fundamental." In *Murgia*, the Court refused to a apply the strict scrutiny rule to a mandatory retirement statute which required that state police officers retire at age fifty, and upheld the constitutionality of the statute under

---

1. In this latter respect, plaintiff notes that the ordinance allows issuance of a public chauffeur's license to certain other ex-offenders whose convictions pre-date application for such a license by more than eight years. In addition, persons convicted of certain other felonies may be issued a license irrespective of the date of conviction, if they have been honorably discharged from a branch of the Armed Services in the interim.

the Equal Protection Clause on the ground that the classification was rationally related to a legitimate state objective:

> "[T]he State's classification rationally furthers the purpose identified by the State: Through mandatory retirement at age 50, the legislature seeks to protect the public by assuring physical preparedness of its uniformed police. Since physical ability generally declines with age, mandatory retirement at 50 serves to remove from police service those whose fitness for uniformed work presumptively has diminished with age." 427 U.S. at 314, 96 S.Ct. at 2567, 49 L.Ed.2d at 525–526.

Nor do I believe the strict scrutiny rule should be applied on the ground that the legislative classification operates to the peculiar disadvantage of a "suspect class". Indicative of classifications which have been strictly scrutinized on the ground that they affect a "suspect class" are those based upon race: *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); alienage: *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); ancestry or nationality: *Oyama v. California*, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948) and possibly sex: *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).[2]

The Supreme Court has noted that a suspect class is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Rodriguez, supra*, 411 U.S. at 28, 93 S.Ct. at 1294. *Murgia, supra*. Admittedly, significant societal disabilities often derive solely from the fact that a person is an ex-offender, particularly in the area of employment opportunities. Nevertheless, the Supreme Court decisions which have considered expanding the category of "suspect" classifications have shown a clear reluctance to do so. See, for example, the concurring opinions of Justices Stewart and Powell, expressing the views of four members of the Court, in *Frontiero*, and the Court's recent decision in *Murgia*, in which the Court declined an opportunity to include the aged as a "suspect class", notwithstanding the Court's acknowledgement that "the treatment of the aged in this Nation has not been wholly free of discrimination . . ." Accordingly, I would not deem ex-offenders to constitute a "suspect class" for purposes of the Equal Protection Clause, and would hold the strict scrutiny rule inapplicable.

**2.** In *Frontiero*, the Court held unconstitutional a statutory scheme which required that, in order to claim a spouse as a "dependent" for the purposes of obtaining increased quarters allowances and medical and dental benefits, a female member of the armed services had to establish that she contributed to over one-half of her husband's support. The same statutory scheme allowed a serviceman to claim his wife as a "dependent" without regard to whether she, in fact, was dependent upon him for any part of her support. The Opinion of the Court was authored by Justice Brennan on behalf of himself and Justices Douglas, White and Marshall. Justice Stewart's brief concurrence agreed "that the statutes before us work an invidious discrimination in violation of the Constitution. *Reed v. Reed*, 404 U.S. 71 [92 S.Ct. 251, 30 L.Ed.2d 225]". Chief Justice Burger and Justice Blackmun joined in an opinion authored by Justice Powell concurring in the judgment but expressing the view that "it is unnecessary for the Court in this case to characterize sex as a suspect classification, with all of the far-reaching implications of such a holding. *Reed v. Reed*, 404 U.S. 71 [92 S.Ct. 251, 30 L.Ed.2d 225] . . . which abundantly supports our decision today, did not add sex to the narrowly limited group of classifications which are inherently suspect. In my view, we can and should decide this case on the authority of *Reed* and reserve for the future any expansion of its rationale." 411 U.S. at 691–692, 93 S.Ct. at 1773. It thus remains less than clear whether sex is a "suspect class" for the purpose of applying the strict scrutiny test. See, *Kahn v. Shevin*, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974); *Geduldig v. Aiello*, 417 U.S. 484, 496 n. 20, 94 S.Ct. 2485, 41 L.Ed.2d 256 and Brennan J., dissenting at 497–505, 94 S.Ct. 2485; *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Stanton v. Stanton*, 421 U.S. 7, 13, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), *Craig v. Boren*, —— U.S. ——, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

It follows that the constitutionality of the ordinance under the Equal Protection Clause does not hinge on whether or not the statute is necessary to promote a compelling governmental interest. The defendant need only establish that the classification is rationally related to a legitimate legislative purpose. I believe that standard has been satisfied in this case.

Clearly, the City of Chicago has a legitimate interest in promoting public safety, and in this connection, may regulate the issuance of public chauffeur's licenses so as to better insure that the character and competence of the licensee is consistent with the high standards traditionally imposed upon common carriers with respect to the care and safety of public passengers. As the defendant correctly argues, persons who choose to be transported in taxicabs obviously are unable to make an informed choice in selecting the driver, and therefore are entitled to assume that, having been licensed by the City, the licensee is a person of satisfactory character and competence. No doubt the City of Chicago has a legitimate interest in attempting to insure that public chauffeur licensees are persons of good character, capable of being entrusted with the operation of a public passenger vehicle.

There is also a rational basis for considering an applicant's prior criminal record in determining whether he is a person of good character, worthy of being entrusted with the responsibilities of a public chauffeur. The past conduct of an applicant may be the best indicator of his present character and his future actions. As the *amicus curiae* brief filed in appellant's behalf by the Chicago Council of Lawyers and the John Howard Association concedes, well over 60% of those arrested for the commission of crimes nationally are ex-offenders.

Accordingly, the distinction drawn between ex-offenders and other applicants for public chauffeur's licenses is rationally related to a legitimate legislative goal, and therefore does not contravene the Equal Protection Clause.[3] I would also reject plaintiff's contention that the ordinance unconstitutionally distinguishes between those convicted of crimes involving the use of a weapon and ex-offenders convicted of certain other offenses. (The ordinance prohibits absolutely the issuance of a public chauffeur's license to the former, but allows under certain circumstances issuance of a license to the latter). Defendant's principal concern in considering the past criminal record of an applicant is the prospect of a driver placing a passenger in physical jeopardy. Accordingly, the ordinance gives greater weight to crimes such as armed robbery and rape than to crimes not involving violence and crimes not directed against other persons. If anything, this added specificity supports the constitutionality of the statute by more narrowly defining the class of persons to whom public chauffeur's licenses may not issue.

### DUE PROCESS

In *Freitag v. Carter*, 489 F.2d 1377 (7th Cir., 1973), this Court held that a governmental licensing body which judges the fitness of an applicant for a public chauffeur's license must, as a matter of due process, afford the applicant adequate notice and a hearing. Freitag held that the applicant was entitled to a hearing and an opportunity to present evidence of his present mental condition, notwithstanding an investigation which showed that, some fourteen years earlier, the applicant had been a patient at a state mental hospital.

In the instant case, plaintiff contends that the absolute bar against issuance to him of a public chauffeur's license on the ground that he was previously convicted of a crime involving the use of a deadly weapon deprives him of rights guaranteed under the Due Process Clause of the Fourteenth

---

**3.** Nor do I believe, as plaintiff contends, that *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) created a new and more stringent equal protection standard in cases which do not require application of the strict scrutiny rule. *Reed* evidences no intention to deviate from the rationality standard, except perhaps in sex discrimination cases, which may well involve a "suspect class". See, n. 4, supra.

Amendment. Plaintiff correctly argues that any hearing held upon his application for a public chauffeur's license would be utterly meaningless, since his status as an ex-offender stands as an absolute bar to the issuance of a license, notwithstanding the amount and/or quality of evidence attesting to his present good character. Thus, plaintiff argues that the ordinance creates an unconstitutional irrebuttable presumption that he is a person of unsatisfactory character, depriving him of any opportunity for a meaningful hearing and thereby denying him due process of law.

The defendant argues that the plaintiff was not deprived of either his "liberty" or "property", and that accordingly, he was not deprived of procedural due process of law by the City's failure to provide a hearing. Defendant's contention in this respect is based primarily on *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), wherein the Court held that an untenured professor who had been hired for one year, following which he was informed that he would not be rehired for the next year, was not deprived of either liberty or property under the Due Process Clause, and therefore was not entitled to a hearing.

I believe the Court in *Roth* sufficiently distinguished the facts of that case from instances involving the issuance or nonissuance of a license, the absence of which forecloses the applicant from an entire range of employment opportunities. *Board of Regents v. Roth, supra* at 574, 92 S.Ct. 2701; *Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). In addition, defendant's contention is implicitly rejected by this Court's decision in *Freitag, supra.*

Consideration of plaintiff's "irrebuttable presumption" argument requires a brief review of the leading, and in some instances, apparently inconsistent case law in this area. In *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), the Court held unconstitutional a Georgia statute which provided that an uninsured motorist's driver's license would be suspended if he became involved in an accident resulting in

damage, and would remain suspended until liability had been determined. The statute did not provide for any hearing procedure under which the driver might avoid suspension of his license by presenting evidence of non-liability for the damage caused in the accident. The Court held that the failure to provide such a hearing deprived uninsured motorists due process of law. While *Bell* does not use the term "irrebuttable presumption", it clearly mandates a "meaningful hearing" at which the licensee might establish his non-liability. "It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision" would not be a meaningful hearing. 402 U.S. at 542, 91 S.Ct. at 1591.

The following year, the Court decided *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), holding unconstitutional an Illinois statute which served absolutely to deprive an unwed father of custody of his illegitimate child. Although the law of Illinois provided that a parent could not be denied custody without notice, a hearing, and proof of parental unfitness, unwed fathers were conclusively presumed to be unfit, and therefore were not afforded a hearing. In holding the statute unconstitutional, the Court stated:

> "It may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents. It may also be that Stanley is such a parent and that his children should be placed in other hands. But all unmarried fathers are not in this category; some are wholly suited to have custody of their children. This much the State readily concedes, and nothing in this record indicates that Stanley is or has been a neglectful father who has not cared for his children." 405 U.S. at 654–655, 92 S.Ct. at 1214.

The *Stanley* Court rejected Illinois' argument that it should not be required to undergo the inconvenience of a hearing because unwed fathers are so seldom fit and proper parents.

> "The establishment of prompt efficacious procedures to achieve legitimate state

ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency . . Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand." 405 U.S. at 656–657, 92 S.Ct. at 1215.

A year later the Court decided *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) and *United States Department of Agriculture v. Murry*, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973). In *Vlandis*, the Court held unconstitutional a Connecticut statute which, in determining the tuition to be paid by students enrolled at a state university, classified as permanent non-residents all unmarried students who had legally resided outside of Connecticut within twelve months prior to applying for admission. Relying on *Stanley*, the Court held that:

"The State's interest in administrative ease and certainty cannot, in and of itself, save the conclusive presumption from invalidity under the Due Process Clause where there are other reasonable and practicable means of establishing the pertinent facts on which the State's objective is premised. In the situation before us, reasonable alternative means for determining bona fide residence are available." 412 U.S. at 451, 93 S.Ct. at 2236.

In *Murry*, the Court held unconstitutional Section 5(b) of the Food Stamp Act, 7 U.S.C. Section 2014(b) which, in effect, denied food stamp eligibility to any household containing a person eighteen years or older who had been claimed as a "dependent" for federal income tax purposes within the preceding twelve months by a person not eligible for food stamp relief. The Supreme Court agreed with the District Court's conclusion that the Act created "an irrebuttable presumption contrary to fact."

Consistent with the aforementioned decisions, the Court subsequently decided *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). In *LaFleur*, the Court held unconstitutional a maternity leave rule requiring a pregnant teacher to commence maternity leave five months prior to the expected birth of her child, and precluding re-employment prior to three months following birth. The Court held that the principles enunciated in *Stanley* and *Vlandis* were controlling, and that "the conclusive presumption embodied in these rules, like that in *Vlandis*, is neither 'necessarily [nor] universally true,' and is violative of the Due Process Clause." 414 U.S. at 646, 94 S.Ct. at 799.

More recently, the Court again applied the "irrebuttable presumption" rule, holding unconstitutional a Utah statute which rendered pregnant women ineligible for unemployment benefits for a period extending from twelve weeks before the expected date of childbirth until six weeks following childbirth: "The presumption of incapacity and unavailability for employment created by the challenged provision is virtually identical to the presumption found unconstitutional in" *LaFleur*. Thus, the Court concluded "that the Utah unemployment compensation statute's incorporation of a conclusive presumption of incapacity during so long a period before and after childbirth is constitutionally invalid under the principles of the *LaFleur* case." *Turner v. Dept. of Employment Security*, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975).

Balanced against the foregoing authorities are cases involving mandatory retirement statutes and the Supreme Court's decision in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In *McIlvaine v. Pennsylvania*, 415 U.S. 986, 94 S.Ct. 1583, 39 L.Ed.2d 884 (1975), the Court dismissed, for want of a substantial federal question, an appeal from the Pennsylvania Supreme Court which upheld a state law

requiring retirement of police at age sixty. *McIlvaine* was quickly interpreted as upholding the constitutionality of mandatory retirement statutes against equal protection and due process claims. Thus the Second Circuit in *Rubino v. Ghezzi*, 512 F.2d 431 (2nd Cir., 1975) affirmed the District Court's refusal to convene a three judge district court in an action challenging a state statute requiring retirement of judges at age seventy. The *Rubino* Court held that "the issues of equal protection and due process [irrebuttable presumption] were before the Court in *McIlvaine*, and  :  .  . the Supreme Court did not consider those issues to present a substantial federal question." 512 F.2d at 433.

The Sixth Circuit followed *Rubino* in *Talbot v. Pyke*, 533 F.2d 331 (1976) affirming summary judgment in defendant's favor in an action challenging an Ohio statute requiring retirement at age seventy.

In this circuit, the issue was presented in *Gault v. Garrison*, 523 F.2d 205 (1975) in which a tenured school teacher was forced to retire at age sixty-five pursuant to school board policy. Plaintiff challenged the policy on equal protection grounds and as an irrebuttable presumption in violation of the Due Process Clause. In *Gault*, this Court took note of the Supreme Court's dismissal "for want of a substantial federal question" of the appeal in *McIlvaine*. It was further noted that a three judge district court in *Weisbrod v. Lynn*, 383 F.Supp. 933 (D.D.C.1974), had held that the dismissal for want of a substantial federal question in *McIlvaine* required dismissal of a constitutional challenge made by plaintiff Weisbrod, a HUD attorney, to a Federal law mandating retirement at age seventy. The Supreme Court summarily affirmed. *Weisbrod v. Lynn*, 420 U.S. 940, 95 S.Ct. 1319, 43 L.Ed.2d 420 (1975).

The *Gault* Court recognized that if *Weisbrod* and *McIlvaine* were to be considered binding precedents, they would not be distinguishable from the *Gault* case. However, the Court declined to resolve the merits of the case, and stayed further proceedings pending the Supreme Court's decision

in *Massachusetts Board of Retirement v. Murgia*, with respect to which the Supreme Court had recently noted probable jurisdiction. 421 U.S. 974, 95 S.Ct. 1973, 44 L.Ed.2d 466 (1975). The hope, obviously, was that the Supreme Court in *Murgia* would resolve the due process question presented by plaintiff *Gault*—i. e., whether a mandatory retirement statute creates an unconstitutional irrebuttable presumption that, because of age, the employee is unable to continue to adequately perform the services for which he has been hired.

As did the panel in *Gault*, we also awaited the Supreme Court's decision in *Murgia*, hoping that further light might be shed on the constitutionality of statutes creating irrebuttable presumptions, particularly in view of the Court's decision in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), discussed *infra*, upholding the constitutionality of a statute which quite obviously creates an irrebuttable presumption and forever excludes certain persons from receiving certain benefits under the Social Security Act.

On June 25, 1976, the Supreme Court decided *Murgia*, without discussing the constitutionality of mandatory statutes under the Due Process Clause, and without characterizing the statute, requiring retirement of Massachusetts State Police at age fifty, as creating an irrebuttable presumption that officers over the age of fifty are physically unable adequately to perform the duties of a Massachusetts state police officer. The *Murgia* Court upheld the constitutionality of the statute in question solely on equal protection grounds holding that the strict scrutiny rule was not applicable, that the statute was designed to achieve a legitimate legislative purpose and that the classification was rationally related to the achievement of that purpose.

In the interim, the Court decided *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), upholding the constitutionality of a provision of the Social Security Act which defined "widow" and "child", for the purpose of survivor's benefits to exclude the widow or step-child of

any deceased wage earner who had been the husband or step-father of the claimant for a period of less than nine months at the time of death. The stated purpose of the rule was to discourage sham marriages designed to enable one spouse to claim benefits upon the anticipated early death of the wage earner. The *Salfi* Court held that:

"The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule. We conclude that the duration-of-relationship test meets this constitutional standard." 422 U.S. at 777, 95 S.Ct. at 2472.

In reaching this conclusion, the Court placed a heavy emphasis on the fact that "social welfare legislation" was involved, requiring broader discretion in the use of legislative classifications in order to maximize the use of available funds and resources. Thus, the Court quoted extensively from its prior decisions in *Flemming v. Nester*, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).[4] *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).[5] *Richardson v. Belcher*, 404 U.S. 78, 81 [92 S.Ct. 254, 30 L.Ed.2d 231] (1971)[6] and *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). Consistent with its emphasis that the claim in *Salfi* was distinguishable because social welfare legislation was involved, the Court declined to follow *Stanley* and *LaFleur* on the

ground that, unlike the claims asserted in those cases, *Salfi* involved:

"a noncontractual claim to receive funds from the public treasury [which] enjoys no constitutionally protected status, *Dandridge v. Williams, supra,* though of course Congress may not invidiously discriminate among such claimants on the basis of a 'bare congressional desire to harm a politically unpopular group,' *United States Dept. of Agriculture v. Moreno,* 413 U.S. 528 [534, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782] (1973), or on the basis of criteria which bear no rational relation to a legitimate legislative goal. *Jimenez v. Weinberger,* 417 U.S. 628 [636, 94 S.Ct. 2496, 2501, 41 L.Ed.2d 363] (1974); *United States Dept. of Agriculture v. Murry,* 413 U.S. 508 [513–514, 93 S.Ct. 2832, 2835, 37 L.Ed.2d 767] (1973)." 422 U.S. at 772, 95 S.Ct. at 2470.

The Court distinguished *Vlandis* on the ground that "the Social Security Act does not purport to speak in terms of the bona fides of the parties to a marriage, but then make plainly relevant evidence of such bona fides inadmissible." 422 U.S. at 772, 95 S.Ct. at 2470.

I find some difficulty in so easily distinguishing *Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974), wherein the Court declared unconstitutional a provision of the Social Security Act which, in effect, precluded an illegitimate child born after the onset of the parent's disability, from obtaining disability benefits, unless the child were eligible under other provisions of the Act regarding legitimization, inheritance or defective marriage ceremonies. The *Jimenez* Court concluded that the purpose of the statutory scheme was to prevent spurious claims and

---

**4.** "Particularly when we deal with a withholding of a noncontractual benefit under a social welfare program such as [Social Security], we must recognize that the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification." 363 U.S. at 611, 80 S.Ct. at 1373.

**5.** "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made

by its laws are imperfect." 397 U.S. at 485, 90 S.Ct. at 1161.

**6.** "A statutory classification in the area of social welfare is consistent with the Equal Protection Clause of the Fourteenth Amendment if it is 'rationally based and free from invidious discrimination' . . . ." 404 U.S. at 81, 92 S.Ct. at 257.

insure that only those actually entitled to disability benefits received such payments. The Court, distinguishing *Dandridge* on the ground that the purpose of the legislative provision in *Jimenez* did not concern the allocation of finite resources, gave considerable weight to the fact that the classification created an irrebuttable presumption, noting that the dilemma of noneligible illegitimate children "is compounded by the fact that the statute denies them any opportunity to prove dependency in order to establish their 'claim' to support and, hence, their right to eligibility." 417 U.S. at 635, 94 S.Ct. at 2501. In this respect, the Court noted that:

"It does not follow, however, that the blanket and conclusive exclusion of appellants' subclass of illegitimates is reasonably related to the prevention of spurious claims. Assuming that the appellants are in fact dependent on the claimants, it would not serve the purposes of the Act to conclusively deny them an opportunity to establish their dependency and their right to insurance benefits . . ." 417 U.S. at 636, 94 S.Ct. at 2501.

The Court concluded that "to conclusively deny one subclass benefits presumptively available to the other denies the former the equal protection of the laws guaranteed by the due process provision of the Fifth Amendment." 417 U.S. at 637, 94 S.Ct. at 2502.[7]

Similarly, notwithstanding the Court's effort to distinguish them, the *Salfi* decision is difficult to square with *Stanley, Vlandis* and *LaFleur*. The challenged provision in *Salfi* clearly creates an irrebuttable presumption, and in view of the Court's decisions in *Murry* and *Jimenez*, the fact that the Social Security Act is involved would not seem to be a wholly dispositive factor. Particularly with respect to *Vlandis*, the basis for distinction is difficult to comprehend. The Court seems to be saying that both the residency rule in *Vlandis* and the challenged provision in *Salfi* "speak in

terms of the bona fides of the parties", but unlike the residency rule in *Vlandis*, the challenged provision in *Salfi* does not "make plainly relevant evidence of such bona fides inadmissible." 422 U.S. at 772, 95 S.Ct. at 2470. But clearly, the statutory provision under consideration in *Salfi* did nothing less than preclude a widow, who married the deceased wage earner less than nine months prior to his death, from presenting evidence that the marriage was not a sham designed to enable one spouse to claim benefits upon the death of the other.

The extent to which the foregoing cases conflict with one another, and the extent to which the irrebuttable presumption rule has been criticized, leads the majority to conclude that

"we cannot say whether the irrebuttable presumption doctrine or the substitute analysis followed in *Salfi* would be thought appropriate for this case by a majority of the Supreme Court. Inasmuch as our equal-protection holding decides this case, it is unnecessary to reach the more difficult due process question."

As previously indicated, I believe it is necessary to resolve the due process issue, and would do so in plaintiffs' favor.

A careful reading of the *Salfi* decision suggests that present in that case were a combination of factors which might render application of the irrebuttable presumption rule inappropriate. First is the already discussed fact that the challenged provision was but a part of a comprehensive social welfare legislative scheme. Secondly, the Court noted that the "prophylactic approach" obviates the need to expend limited social welfare resources for the purpose of considering "large numbers of individualized determinations". The Court also recognized that the duration-of-relationship rule protects claimants, whose relationship with the deceased exceeded nine months, from the "uncertainties and delays of administrative inquiry into the circumstances of their marriages." Further, the Court

---

7. For the same reasons, the *Salfi* decision is difficult to distinguish, on the basis of applicable legal principles, from the Court's decision in

*U. S. Dept. of Agriculture v. Murry*, 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973).

noted that the very existence of the rule could discourage sham marriages. Finally, and perhaps most importantly, the Court recognized that it is not "at all clear that individual determinations could effectively filter out sham arrangements, since neither marital intent, life expectancy nor knowledge of terminal illness has been shown by appellees to be reliable determinable." 422 U.S. at 782–783, 95 S.Ct. at 2475.

This Court has already recognized the special status afforded social welfare legislation in the context of a classification which might otherwise be viewed as creating an unconstitutional irrebuttable presumption. *Fisher v. Secretary of U. S. Dept. of Health, Ed. and Welfare*, 522 F.2d 493 (7th Cir., 1975).

In addition, some consideration must be given to the extent to which individualized determinations of eligibility would so burden the system as to substantially interfere with achievement of the legislative goal. In *Vlandis*, for example, the Court specifically noted that, as alternatives to the conclusive presumption in that case "there are other reasonable and practical means of establishing the pertinent facts on which the State's objective is premised." 412 U.S. at 451, 93 S.Ct. at 2236. Similarly, the *LaFleur* Court observed that "school boards have available to them reasonable alternative methods of keeping physically unfit teachers out of the classroom." 414 U.S. at 647, n. 14, 94 S.Ct. at 800.

Thus, while "an interest in devising prompt and efficient procedures to achieve legitimate objectives . . ." will not suffice to justify classifications which constitute irrebuttable presumptions, *LaFleur, supra*, at 646, 94 S.Ct. at 799,[8] it nevertheless would appear that a classification will not be held unconstitutional where individualized determinations of eligibility will necessarily and significantly interfere with the satisfactory operation of an overall legisla-

tive scheme. Such instances might well be limited to large and comprehensive social welfare programs, such as those encompassed under the Social Security Act, involving distribution of benefits to millions of claimants and requiring the promulgation of prophylactic rules concerning eligibility.

Finally, the *Salfi* Court emphasized that individual determinations might not effectively filter out sham marital arrangements. I think it is safe to say that in most other instances, adequate hearing procedures will advance, rather than retard, the fact-finding process.

Turning to the ordinance challenged by plaintiff Miller, none of the foregoing considerations are applicable. I therefore believe we should be guided by the Court's decisions in *Stanley, Vlandis* and *LaFleur*. Of particular significance is the fact that, subsequent to the decision in *Salfi*, the Court applied the irrebuttable presumption rule in holding a statutory provision unconstitutional. *Turner v. Dept. of Employment Security*, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975).

As in *Vlandis*, the hearing procedure which this Court required in *Freitag* offers a "reasonable and practical means of establishing the pertinent facts on which the [City's] objective is premised." 412 U.S. at 451, 93 S.Ct. at 2236. Moreover, the use of irrebuttable presumptions of ineligibility is particularly repugnant where they preclude an applicant from ever obtaining the credentials necessary to engage in a particular field of endeavor. The right to engage in a particular type of employment may not be a "fundamental right" for the purposes of the strict scrutiny test, but it is nevertheless a very important right, and one which should not be summarily denied through the use of irrebuttable presumptions of ineligibility. See, *Berger v. Board of Psychologist Exam-*

---

8. As the *Stanley* Court emphasized, the "Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulner-

able citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." 405 U.S. at 656, 92 S.Ct. at 1215.

*iners,* 172 U.S.App.D.C. 396, 521 F.2d 1056 (1975).

Contrary to the defendant's contention, due process arguments based upon the presence of an irrebuttable presumption are not simply indirect efforts to attack a statute on equal protection grounds. Under the Equal Protection Clause, an unconstitutional classification may not be considered in determining eligibility. As indicated *supra,* the past criminal record of an applicant for a public chauffeur's license is a valid consideration in determining the applicant's character and fitness. Due process considerations require only that the applicant be given a meaningful opportunity to present evidence of good character and fitness in contravention of any contrary inference based upon his prior conduct.

As does the majority, I fully recognize that, to say the least, this area of the law continues to evolve. On the one hand, decisions such as *Bell, Stanley, Vlandis, LaFleur* and *Turner* reflect a disdain for irrebuttable presumptions of ineligibility. On the other, the dissenting opinions in each of those cases and the Court's decision in *Salfi* suggest the unworkability of a rule forbidding all conclusive classifications. And as evidenced by the *Murgia* decision, the area involving perhaps the clearest use of conclusive presumptions—mandatory retirement—continues to be tested solely on traditional equal protection grounds. On the basis of what I understand to be the present state of the law, the ordinance in the instant case creates an irrebuttable presumption which deprives plaintiff of a meaningful hearing in violation of the Due Process Clause of the Fourteenth Amendment. Accordingly, I would reverse the judgment of the District Court both on the ground relied upon by the majority, and on the ground that the ordinance deprives the plaintiff of due process of law.