ACCEPTED
15-25-00064-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/7/2025 3:55 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00064-CV

IN THE FIFTEENTH COURT OF APPEALS

TEXAS STATE BOARD OF SOCIAL WORKER EXAMINERS, ET AL.,

*Appellants,*

*v.*

KATHERIN YOUNIACUTT AND TAMMY THOMPSON,

*Appellees.*

Appeal from the 345th Judicial District Court, Travis County

## APPELLEES' RESPONSE BRIEF

Arif Panju
(TX Bar No. 24070380)
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
apanju@ij.org

James T. Knight II*
(DC Bar No. 1671382)
Andrew Ward*
(NY Bar No. 5364393)
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
jknight@ij.org
award@ij.org

*Counsel for Appellees*

*Admitted *pro hac vice*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ............................................................................ iv

STATEMENT OF THE CASE ...................................................................... xi

STATEMENT REGARDING ORAL ARGUMENT ........................................ xii

ISSUES PRESENTED ............................................................................... xiii

INTRODUCTION ......................................................................................... 1

STATEMENT OF FACTS .............................................................................. 2

I.   Factual Background ........................................................................... 2

II.  Procedural History ............................................................................ 7

SUMMARY OF ARGUMENT ......................................................................... 8

ARGUMENT ............................................................................................... 11

I.   Sovereign Immunity Is Inapplicable ................................................. 11

   A.  The Official-Capacity Defendants Are Proper ........................... 13

   B.  There Are No "Basic Pleading Defects" ..................................... 14

II.  Plaintiffs Properly Pleaded A Substantive Due-Course-of-Law
     Claim .............................................................................................. 17

   A.  Plaintiffs Properly Pleaded A Liberty Interest ........................... 18

   B.  Plaintiffs Have A Viable Claim That The Ban Fails *Patel* ........... 29

   C.  Claims Like Plaintiffs' Have Succeeded In Other Jurisdictions
       Less Protective Of Economic Liberty ........................................ 37

III. Plaintiffs Properly Pleaded A Procedural Due-Course-of-Law
     Claim .............................................................................................. 42

   A.  Plaintiffs' Procedural Claim Is Recognized In Texas .................. 42

   B.  Section 19 Requires Individualized Process For Individualized
       Deprivations Of Liberty .............................................................. 43

   C.  Claims Like Plaintiffs' Routinely Succeed In Other
       Jurisdictions ............................................................................... 46

IV.  Plaintiffs Properly Pleaded An Equal Rights Claim .............................48

    A.  Plaintiffs' Equal Rights Claim Is Recognized In Texas ................48

    B.  Claims Like Plaintiffs' Succeed In Other Jurisdictions.................51

PRAYER .........................................................................................53

CERTIFICATE OF SERVICE...............................................................54

CERTIFICATE OF COMPLIANCE..........................................................55

iii

# INDEX OF AUTHORITIES

**Cases**

*Abbott v. Mexican Am. Legislative Caucus, Tex. House of Representatives (MALC),*
  647 S.W.3d 681 (Tex. 2022) ...................................................................... 13

*Barletta v. Rilling,*
  973 F. Supp. 2d 132 (D. Conn. 2013) ....................................38, 41, 42, 52

*Brewer v. Dep't of Motor Vehicles,*
  93 Cal. App. 3d 358 (1979) ....................................................................... 39

*Brown v. Smith,*
  2024 WL 2819224 (E.D. Va. June 3, 2024) .............................................. 38

*Butts v. Nichols,*
  381 F. Supp. 573 (S.D. Iowa 1974) .......................................................... 38

*Chunn v. State ex rel. Miss. Dep't of Ins.,*
  156 So. 3d 884 (Miss. 2015) ...............................................38, 40, 42, 52

*City of El Paso v. Heinrich,*
  284 S.W.3d 366 (Tex. 2009) ............................................................... 12, 13

*Cox v. Robison,*
  150 S.W. 1149 (Tex. 1912) ........................................................................ 21

*Cronin v. O'Leary,*
  2001 WL 919969 (Mass. Super. Ct. Aug. 9, 2001) .............................. 39, 48

*Tex. Dep't of State Health Servs. v. Crown Distrib. LLC,*
  647 S.W.3d 648 (Tex. 2022) .......................................................... 19, 20, 21

*Davis v. Homeowners of Am. Ins. Co.,*
  700 S.W.3d 837 (Tex. App.—Dallas 2023, no pet.) ................................. 16

*Dent v. West Virginia,*
  129 U.S. 114 (1889) .................................................................................. 24

iv

*Dep't of Transp. v. Ass'n of Am. R.R.s,*
　575 U.S. 43 (2015) .................................................................... 22

*Eriksen v. Nelson,*
　708 S.W.3d 302 (Tex. App.—15th Dist. 2025, no pet.) ........................... 14

*Fields v. Dep't of Early Learning,*
　434 P.3d 999 (Wash. 2019) .................................................. 38, 46, 48, 47

*Furst v. N.Y.C. Transit Auth.,*
　631 F. Supp. 1331 (E.D.N.Y. 1986) ............................................... 38

*Green v. Mo. Pac. R.R.,*
　523 F.2d 1290 (8th Cir. 1975) ..................................................... 42

*Greene v. McElroy,*
　360 U.S. 474 (1959) .................................................................... 24

*Gregg v. Lawson,*
　732 F. Supp. 849 (E.D. Tenn. 1989) .................................. 38, 47, 48, 51, 52

*Haveman v. Bureau of Prof. & Occupational Affairs,*
　238 A.3d 567 (Pa. Commw. Ct. 2020) .......................................... 40, 51, 52

*Honors Acad., Inc. v. Tex. Educ. Agency,*
　555 S.W.3d 54 (Tex. 2018) .......................................................... 17

*Johnson v. Allegheny Intermediate Unit,*
　59 A.3d 10 (Pa. Commw. Ct. 2012) ............................................... 39

*Kindem v. City of Alameda,*
　502 F. Supp. 1108 (N.D. Cal. 1980) .............................................. 38

*Klumb v. Hous. Mun. Emps. Pension Sys.,*
　458 S.W.3d 1 (Tex. 2015) ....................................................... 14, 49

*Lewis v. Ala. Dep't of Pub. Safety,*
　831 F. Supp. 824 (M.D. Ala. 1993) ............................................... 38

*Matthews v. Eldridge,*
424 U.S. 319 (1976) ........................................................................43

*Matzen v. McLane,*
659 S.W.3d 381 (Tex. 2021) ......................................44, 46, 48

*McFadden v. Longham,*
58 Tex. 579 (1883) ........................................................................44

*Meyer v. Nebraska,*
262 U.S. 390 (1923) .......................................................................24

*Miller v. Carter,*
547 F.2d 1314 (7th Cir. 1977)......................................................38

*Miller v. Carter,*
434 U.S. 356 (1978).......................................................................38

*Mosley v. Tex. Health & Hum. Servs. Comm'n,*
593 S.W.3d 250 (Tex. 2019)........................................................43

*Nixon v. Commonwealth,*
839 A.2d 277 (Pa. 2003) ..............................................................39

*Patel v. Tex. Dep't of Licensing & Regulation,*
469 S.W.3d 69 (Tex. 2015)............................................... *passim*

*Peake v. Commonwealth,*
132 A.3d 506 (Pa. Commw. Ct. 2015) .......................................39

*Pentco, Inc. v. Moody,*
474 F. Supp. 1001 (S.D. Ohio 1978) ..........................................39

*Perrine v. Mun. Ct.,*
488 P.2d 648 (Cal. 1971) ..............................................................39

*Rivera v. Sonnenschein,*
No. 03-21-00516-CV, 2022 WL 1751685 (Tex. App.—Austin June 1, 2022, pet. denied) .......................................................................35

*Rosenberg Dev. Co. v. Imperial Performing Arts, Inc.*,
571 S.W.3d 738 (Tex. 2019).................................................................. 19

*Sec'y of Revenue v. John's Vending Corp.*,
309 A.2d 358 (Pa. 1973)........................................................................40

*Shimose v. Haw. Health Sys. Corp.*,
345 P.3d 145 (Haw. 2015) .....................................................................40

*Slaughter-House Cases*,
83 U.S. (16 Wall.) 36 (1873) .............................................................21, 23

*Smith v. Decker*,
312 S.W.2d 632 (Tex. 1958) .................................................................. 24

*Smith v. Fussenich*,
440 F. Supp. 1077 (D. Conn. 1977)................................................... 38, 47

*State v. Fisher*,
52 Mo. 174 (1873) ................................................................................ 27

*State v. Loe*,
692 S.W.3d 215 (Tex. 2024)................................................................... 35

*Stout v. Grand Prairie Indep. Sch. Dist.*,
733 S.W.2d 290 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) .....................49

*Tanner v. De Sapio*,
150 N.Y.S.2d 640 (N.Y. Sup. Ct. 1956).................................................40

*Tex. Dep't of Ins. v. Tex. Ass'n of Health Plans*,
598 S.W.3d 417 (Tex. App.—Austin 2020, no pet.)..................................15

*Tex. Parks & Wildlife Dep't v. RW Trophy Ranch, Ltd.*,
712 S.W.3d 943 (Tex. App.—15th Dist. 2025, no pet.) .............12, 14, 20-21

*Tex. S. Univ. v. Villarreal*,
620 S.W.3d 899 (Tex. 2021) ..................................................................17

vii

*Univ. of Tex. Med. Sch. at Hous. v. Than,*
 901 S.W.2d 926 (Tex. 1995) .................................................................. 42, 43

*Warren Cnty. Hum. Servs. v. State Civ. Serv. Comm'n,*
 844 A.2d 70 (Pa. Commw. Ct. 2004) ...........................................................39

*Young v. Texas Parks & Wildlife Dep't,*
 No. 15-24-00052-CV, 2025 WL 1200947 (Tex. App.—15th Dist. Apr. 24,
 2025, no pet. h.) .................................................................................20-21

## Codes

22 Tex. Admin. Code § 882.3 .................................................................. 45

Tex. Civ. Prac. & Rem. Code § 37.003 ........................................................ xi

Tex. Civ. Prac. & Rem. Code § 37.006(b) ................................................... 12

Tex. Occ. Code § 53.021................................................................................50

Tex. Occ. Code § 53.021(a) ........................................................................... 4

Tex. Occ. Code § 53.023 ................................................................... 4, 34, 38

Tex. Occ. Code § 108.051................................................................... 5, 50

Tex. Occ. Code § 108.052 ................................................................ xi, 5, 50

Tex. Occ. Code § 108.052(1) .......................................................................5

Tex. Occ. Code § 108.052(2) .......................................................................5

Tex. Occ. Code § 108.052(3)........................................................................5

Tex. Occ. Code § 505.351(a) .......................................................................3

## Constitutional Provisions

Tex. Const. art. I, § 3 ......................................................................... *passim*

Tex. Const. art. I, § 19.......................................................................... *passim*

## Historical Sources

*A New Political Platform*, GALVESTON DAILY NEWS, June 11, 1874 ............. 23

*Address to the Freedmen of Texas*, SEMI-WEEKLY STATE GAZETTE (Austin),
Nov. 21, 1865 ....................................................................................... 25

*Current Comment*, EVENING TRIBUNE (Galveston), Apr. 29, 1886 .............. 26

DENISON DAILY HERALD, Dec. 22, 1878 ................................................ 25, 26

FORT WORTH STANDARD, July 8, 1875 .......................................................... 26

Hon. W.W. Lang, *Definition of His Attitude in State Politics*, DALLAS DAILY
HERALD, May 15, 1880........................................................................... 28

*Injustice of the Occupation Tax*, DENISON DAILY NEWS, May 19, 1876........ 23

*Liberty*, 1 ALEXANDER M. BURRILL, A LAW DICTIONARY & GLOSSARY (2d ed.
1871) ...................................................................................................... 22

*Liberty*, WEBSTER'S INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE:
BEING AN AUTHENTIC EDITION OF WEBSTER'S UNABRIDGED DICTIONARY,
COMPRISING THE ISSUES OF 1864, 1879, AND 1884 (Noah Porter ed.,
reference history ed. 1907)................................................................... 22

*Lumber Inspection*, GALVESTON DAILY NEWS, Apr. 9, 1875 .................... 26-27

*Railways*, JACKSBORO GAZETTE, Jan. 17, 1889............................................. 28

Tex. Att'y Gen. Op. No. 3438 (To Seller of Brandy Fruits, Aug. 24, 1875),
TEX. STATE LIBR. AND ARCHIVES COMM'N, BOX 2006/216-1
[https://perma.cc/KZ2L-C8Z3].............................................................. 27

*The Occupation Tax*, GALVESTON DAILY NEWS, May 18, 1876 ................ 23, 26

*Wedlock of Labor and Capital*, GALVESTON DAILY NEWS, Jan. 19, 1879 ...... 26

*Whither Are We Drifting?*, DAILY DEMOCRAT (Fort Worth), Aug. 15, 1877 . 26

**Other Authorities**

Eric Dexheimer, *She beat addiction and earned a master's in social work to help others. A stealth Texas law said no.*, HOUS. CHRON. (Oct. 15, 2023), https://www.houstonchronicle.com/politics/texas/article/masters-degree-law-crime-18411428.php ................................................................. 5

Nat'l Ass'n of Soc. Workers, Social Work History, https://www.socialworkers.org/News/Facts/Social-Work-History ......... 3

Stephen Simpson, *A push to change a 2019 Texas law that bars certain felons from becoming social workers*, TEX. TRIB. (Nov. 13, 2024), https://www.texastribune.org/2024/11/13/texas-social-workers-ban-lawsuit/ ............................................................................................ 6

Tex. State Bd. of Soc. Worker Exam'rs, Self-Evaluation Report 7 (2017), https://www.sunset.texas.gov/public/uploads/files/reports/Social%20W orkers%20Self-Evaluation%20Report.pdf ................................................. 3

Tex. Sunset Advisory Comm'n, Staff Report on the Council for Social Work Certification 9 (1982), https://www.sunset.texas.gov/public/uploads/files/reports/Council%20f or%20Social%20Work%20Certification%20Staff%20Report%201982%2 068th%20Leg.pdf .................................................................................... 3

## STATEMENT OF THE CASE

*Nature of the Case:*  Katherin Youniacutt and Tammy Thompson brought this action for declaratory and injunctive relief challenging the constitutionality of a Texas law that permanently bars them from becoming licensed social workers—Tex. Occ. Code § 108.052 and 22 Tex. Admin. Code § 882.42(e)—under Article I, §§ 3 and 19 of the Texas Constitution and the Uniform Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code § 37.003. They sued Defendants-Appellants, the state agencies and officials who enforce the challenged law.

*Course of Proceedings:*  Defendants filed a motion to dismiss and a plea to the jurisdiction asserting that sovereign immunity deprived the district court of jurisdiction to hear Plaintiffs' claims for purely prospective equitable relief under the Texas Constitution.

*Trial Court:*  345th Judicial District Court, Travis County, Hon. Laurie Eiserloh, presiding.

*Trial Court Disposition:*  In an order issued April 14, 2025, the district court denied Defendants' motion to dismiss and plea to the jurisdiction. Defendants then filed this interlocutory appeal on the denial of the plea.

xi

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs agree with Defendants that oral argument will aid the Court in this matter. This appeal requires resolution of important questions about the application of Texas Supreme Court precedent and the pleading requirements when bringing a prospective constitutional challenge to a state statute.

## ISSUES PRESENTED

1. Whether Texas law immunizes the state from "properly pleaded" suits for prospective equitable relief against unconstitutional statutes and unconstitutional official action.

2. Whether, under *Patel*, Plaintiffs properly pleaded their claims that a Texas law permanently barring them from practicing social work based solely on old and irrelevant convictions violates Article I, Sections 3 and 19 of the Texas Constitution.

## INTRODUCTION

This lawsuit challenges the constitutionality of a state statute that permanently and unreasonably deprives Plaintiffs of their right to earn an honest living in their chosen occupation of social work. *See* CR.188–90. The law permanently bans Plaintiffs from receiving social work licenses because each has a single assault conviction from the 2000s. But in the nearly two decades since their convictions, Plaintiffs turned their lives around, became fully qualified, and now want to harness their personal experiences of overcoming challenges to help others do the same.

Plaintiffs allege that the ban violates two clauses of the Texas Constitution: Due Course of the Law of the Land and Equal Rights. Defendants (the state agencies and officials who enforce the ban) asked the trial court to dismiss Plaintiffs' claims for lack of jurisdiction, but the trial court rightly allowed the case to proceed to discovery under the Texas Supreme Court's 2015 decision in *Patel v. Texas Department of Licensing & Regulation*, 469 S.W.3d 69. Defendants have now filed this interlocutory appeal, essentially asking this Court to ignore *Patel*. But at every turn, *Patel* controls this case. Under *Patel*, the basis for Defendants' arguments— sovereign immunity—is "inapplicable" because Plaintiffs' constitutional claims are free from "basic pleading defects." *Id*. at 75, 77. Even if the Court

requires more, under *Patel*, Plaintiffs' claims can easily proceed to discovery. *Id.* at 77.

At bottom, Defendants bank their appeal on *Patel* no longer being good law. That argument rests on dicta, concurrences, and dissents rather than controlling authority. The question here is only whether Plaintiffs met their basic obligations in drafting a petition. *Patel* says they did—and although no more is needed, close to two dozen other cases hold that analogous claims win on the merits. That of course means that Plaintiffs can get past the pleadings. The district court was right not to dismiss, and this Court should affirm.

## STATEMENT OF FACTS

### I. Factual Background

Plaintiffs Katherin Youniacutt and Tammy Thompson are two Texas grandmothers with a passion for helping others overcome the same challenges they did. CR.194, 196, 200, 202–03. Many years ago, Katherin turned to alcohol as a young woman to cope with the trauma of clerical abuse, and Tammy used methamphetamine to deal with a difficult divorce from a troubled marriage. CR.195, 201. As a result of their substance abuse, both pleaded guilty to a single assault conviction in the 2000s, for which both were sentenced to probation. CR.195, 201.

2

Katherin and Tammy then turned their lives around. They got clean. CR.195–96, 202. They went back to school. CR.196, 202. And they looked for a way to use their experiences to help others. CR.196, 202. Mental health issues and substance abuse are rampant in Texas, and there is a severe shortage of social workers who can address those problems. CR.206. Katherin and Tammy answered the call and earned master's degrees in social work. CR.196, 202.

Social work—"help[ing] people in their personal and interpersonal lives in order to achieve social improvement"—is not a new occupation; it dates to "the late 19th century." Nat'l Ass'n of Soc. Workers, Social Work History;[1] Tex. Sunset Advisory Comm'n, Staff Report on the Council for Social Work Certification 9 (1982).[2] And until a few decades ago, Texans were free to do social work without state involvement at all. Tex. State Bd. of Soc. Worker Exam'rs, Self-Evaluation Report 7 (2017) (social work certification first created in 1982, licensure requirement first created in 1993).[3] Today, however, practicing social work requires a license. Tex. Occ. Code § 505.351(a). That requirement "is intended to ensure that persons

---

[1] https://www.socialworkers.org/News/Facts/Social-Work-History
[2] https://www.sunset.texas.gov/public/uploads/files/reports/Council%20for%20Social%20Work%20Certification%20Staff%20Report%201982%2068th%20Leg.pdf
[3] https://www.sunset.texas.gov/public/uploads/files/reports/Social%20Workers%20Self-Evaluation%20Report.pdf

3

seeking social services are receiving services from a qualified practitioner." Tex. State Bd. of Soc. Worker Exam'rs, *supra*, at 29.

Katherin and Tammy were confident that their years of training qualified them to practice, but both were concerned that their convictions could pose a problem in getting licensed. The Texas State Board of Social Worker Examiners allayed those fears: when Katherin and Tammy each wrote to the Board to verify that they would be eligible to practice, the Board confirmed that they were "not automatically disqualified" by their convictions. CR.197, 203. In April 2019, the Board assured them that they would receive individualized determinations of their fitness for licensure that considered the whole person, not just their convictions. *Id.* Encouraged, Katherin and Tammy finished their degrees, secured jobs, passed the licensing exam, and applied for state licenses. CR.196–97, 202–03.

They were denied. CR.197–98, 203–04. On September 1, 2019, a new law had gone into effect. CR.194. Before then, the Board's response was correct: the law allowed denial of social work licenses to applicants with certain criminal records, but *only* after an individualized determination that considered the totality of the circumstances, including specific mitigating factors. CR.193–94; Tex. Occ. Code §§ 53.021(a), 53.023. That's the same system that still applies to many other licensed professions in Texas,

4

including the closely related occupations of professional counseling and marriage and family therapy. *See* Tex. Occ. Code § 108.051 (not applying to Licensed Professional Counselors or Licensed Marriage and Family Therapists). But the new law, Tex. Occ. Code § 108.052, imposes an automatic lifetime licensing ban on social work applicants, shutting out anyone with certain convictions before they can reach the discretionary system. CR.194. Those banned convictions include all felonies involving force. *Id.*; Tex. Occ. Code § 108.052(2).[4] Now, people with convictions like Katherin's and Tammy's are permanently ineligible for social work licensure and thus permanently banned from practicing social work in Texas. CR.194; Tex. Occ. Code § 108.052(2).

The 2019 law "passed quietly and under the radar" without public testimony or input from the state authorities who regulate and license social workers. Eric Dexheimer, *She beat addiction and earned a master's in social work to help others. A stealth Texas law said no.*, Hous. Chron. (Oct. 15, 2023).[5] According to Defendant Darrel Spinks, Executive Director of

---

[4] The other convictions resulting in lifetime bans are specified serious offenses (such as sexual assault) committed by a licensed "health care professional" against a patient "in the course of providing" licensed health care services. Tex. Occ. Code § 108.052(3). Plaintiffs do not challenge the Ban with respect to those convictions, nor do they challenge the Ban's application to people "required to register as a sex offender." *Id.* § 108.052(1).

[5] https://www.houstonchronicle.com/politics/texas/article/masters-degree-law-crime-18411428.php

5

Defendant Texas Behavioral Health Executive Council, the Council "just stumbled across it one day." *Id.* Regulators were baffled. Defendant Spinks described his reaction to the law as "Oh, no! Surely this is just something someone forgot," *id.*, and had "no more insight into the rationale for why [the law] was passed than other members of the public." Stephen Simpson, *A push to change a 2019 Texas law that bars certain felons from becoming social workers*, TEX. TRIB. (Nov. 13, 2024).[6] Apparently, the State's own regulators thought the ban was a solution in search of a problem.

Katherin and Tammy's verified allegations illustrate the oppressive real-world effect of that "solution." CR.208. As the many glowing recommendation letters the Board received for each woman attest, Katherin and Tammy are gifted, qualified social workers. CR.198, 204. Katherin, one recommender wrote, "gives hope to the hopeless and provides a voice to those who would otherwise not speak up for themselves." CR.198. Tammy, another told the Board, "would be an asset to th[e] profession" because of her strong values, "life experiences," and dedication to her practice. CR.204. Yet the Ban ties the Board's hands and prevents it from ever even *considering* anything about Katherin and Tammy other than two old convictions that led to probation. CR.213.

---

[6] https://www.texastribune.org/2024/11/13/texas-social-workers-ban-lawsuit/

## II.    Procedural History

With no other way to do the work they trained to do, Katherin and Tammy challenged the Ban, on its face and as applied to them, under Article I, Section 19 (Due Course of the Law of the Land) and Article I, Section 3 (Equal Rights) of the Texas Constitution. CR.215–20. Defendants then filed a plea to the jurisdiction and Rule 91a motion to dismiss. The trial court denied both motions, concluding that Plaintiffs' verified allegations showed that (1) "any danger that otherwise qualified applicants . . . pose to potential clients is not rationally possible to determine on anything other than an individualized basis," (2) the Ban is "irrational" because it excludes potential social workers based "on personal experience directly relevant to" social work, and (3) "considered as a whole, the actual, real-world effect" of the Ban "with respect to social-work licensure—when applied to Plaintiffs and those similarly situated—is not rationally related to the relevant government interest." CR.288–89. Defendants then brought this interlocutory appeal. It is limited to the denial of their plea to the jurisdiction because parties have no right to an immediate review of the denial of a motion to dismiss. CR.294–97.

## SUMMARY OF ARGUMENT

Plaintiffs brought three claims (substantive due course of law, procedural due course of law, and equal rights) against two categories of defendants (the agencies and the officials who enforce the Ban). The only question at this stage is whether the trial court has jurisdiction to hear those claims. It does. Defendants argue that Plaintiffs' claims are so "facially invalid" that the trial court outright lacks jurisdiction. But these claims are not novel: Plaintiffs challenge a health-and-safety licensing restriction just like the plaintiffs did in *Patel*. Those plaintiffs won at the Texas Supreme Court. Bringing a kind of claim that can win on the merits cannot be facially invalid.

*Patel* concerned the state's licensing requirements for eyebrow threaders—people who use a simple cotton thread to remove unwanted facial hair. They needed an esthetician license to practice, even though that license required hundreds of hours of training that was unrelated to health and safety concerns with commercial threading. *Id.* at 73–74. The threaders sued under Article I, Section 19 of the state constitution and alleged a violation of their right "to earn an honest living in the occupation of one's choice free from unreasonable governmental interference." *Id.* at 74.

8

Not only did the Court find that this was a "viable claim" "sufficient" to establish jurisdiction and overcome sovereign immunity, *id.* at 77, it directed a grant of summary judgment for the threaders. *Id.* at 90–92. That was because, even though "statutes are presumed to be constitutional," plaintiffs can overcome that presumption when they demonstrate that either "the statute's purpose could not arguably be rationally related to a legitimate governmental interest," or, "when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to, or is so burdensome as to be oppressive in light of, the governmental interest." *Id.* at 87. And that was just what the evidence showed: the challenged "requirement . . . to become licensed [was] not just unreasonable or harsh, but [was] so oppressive that it violate[d] Article I, § 19 of the Texas Constitution." *Id.* at 90. The Court was clear that the "determination" of whether a licensing restriction violates Section 19 "will in most instances require the reviewing court to consider the entire record, including evidence offered by the parties." *Id.* at 87.

With respect to sovereign immunity and the substantive due-course claim, Plaintiffs here are simply invoking the framework from *Patel*. Under *Patel*, Plaintiffs' claims can proceed barring a "basic pleading defect." Sovereign immunity is "inapplicable." This is true whether those claims are

9

brought against the agencies or the officials who enforce the Ban. (Section I, below).

There is no "basic pleading defect." As *Patel* (and many historical sources) make clear, Plaintiffs' right "to earn an honest living" in a lawful occupation is protected by Article I, Section 19. (Section II-A). Plaintiffs' verified allegations show that the Ban violates that right under the *Patel* test. (Section II-B). Indeed, similar challenges in other jurisdictions have not just gone past the pleadings but outright won—even without the enhanced scrutiny from *Patel*. (Section II-C).

Plaintiffs have also properly pleaded a procedural due-course-of-law claim. Due process requires, at minimum, a meaningful opportunity to be heard. (Section III-A). For laws like the Ban, that means an individualized determination of Plaintiffs' fitness to practice social work, not merely an act of the legislature. (Section III-B). No such determination took place here (or could take place), so there are no basic defects to Plaintiffs' procedural claim—again as other jurisdictions have likewise found. (Section III-C).

Finally, Plaintiffs have properly pleaded an equal rights claim under Article I, Section 3 of the Texas Constitution. Plaintiffs' verified allegations show that the Ban irrationally discriminates between Plaintiffs and other similarly situated people. (Section IV-A). For example, the Ban does not

apply to other therapy professions such as professional counselors and marriage and family therapists. The Texas Constitution requires that laws have a rational basis for drawing such distinctions, and Plaintiffs have alleged that no such basis exists. There is no rational difference that would make Katherin or Tammy safe to talk to clients about how to improve their marriages, but so unsafe as to be banned forever if they want to talk to the same clients about how to improve other relationships. Plaintiffs have met the pleading requirements for an equal rights claim—once again following in the footsteps of successful claims in other jurisdictions. (Section IV-B).

The bottom line is that claims like Plaintiffs' win. A challenge to a licensing requirement won at the Texas Supreme Court (even though the state invoked health and safety) just ten years ago. Challenges to professional bans based on criminal history have won in other jurisdictions again and again. Claims that can win on the merits do not suffer from basic defects on the pleadings.

## ARGUMENT

### I. Sovereign Immunity Is Inapplicable

"[T]his appeal concerns only jurisdictional issues," and the only jurisdictional defect Defendants assert is sovereign immunity. Appellants' Br. 9. Sovereign immunity does not bar suits like this one that seek forward-

looking relief in the form of a declaration or injunction to enforce the Texas Constitution. "[W]hile governmental immunity generally bars suits for *retrospective monetary* relief, it does not preclude *prospective injunctive* remedies" in "suits against government actors who violate statutory or constitutional provisions." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 368–69 (Tex. 2009) (emphases added). *Accord Tex. Parks & Wildlife Dep't v. RW Trophy Ranch, Ltd.*, 712 S.W.3d 943, 962 (Tex. App.—15th Dist. 2025, no pet.) ("Sovereign immunity does not bar a suit for equitable relief based upon an alleged violation of the Texas Constitution[.]"). This is because the "Declaratory Judgment Act . . . waives immunity" for prospective constitutional challenges. *Heinrich*, 284 S.W.3d at 373 n.6 (citing Tex. Civ. Prac. & Rem. Code § 37.006(b) ("UDJA")). *See also Patel*, 469 S.W.3d at 76–77 (recognizing the same). As *Patel* explicitly held, that waiver applies so long as the "pleadings present[] a viable claim" in the sense of being free of "basic pleading defects." 469 S.W.3d at 77. Defendants do not argue that there is any such defect, but nonetheless assert sovereign immunity on the theories that (A) the UDJA waiver does not apply to government officials sued in their official capacity and (B) that the UDJA waiver does not apply because Plaintiffs' claims are wrong on the merits. As explained below, neither theory is correct under Texas law.

## A. The Official-Capacity Defendants Are Proper

Defendants argue that the official capacity defendants are immune from suit (absent an *ultra vires* claim that Plaintiffs did not bring). Appellants Br. 10–12. They base this argument on the claim that the UDJA does not waive immunity for officials, only "entities." *Id.* at 12 (emphasis omitted). Defendants are mistaken.

Constitutional claims for prospective relief are routinely brought against official-capacity defendants. And Defendants' first case on this point doesn't say otherwise: *Heinrich* notes that governmental entities such as municipalities are necessary parties "[f]or claims challenging the validity of ordinances or statutes" but does not address whether officials are *also* appropriate defendants. 284 S.W.3d at 373 n.6. Their second case, *MALC*, clarifies the point: "[t]he identity of the relevant governmental entity for waiver purposes necessarily depends on the statute being challenged," and "case law is replete" with suits "against proper defendants like the Governor and the Secretary of State." *Abbott v. Mexican Am. Legislative Caucus, Tex. House of Representatives (MALC)*, 647 S.W.3d 681, 697 n.7, 698 (Tex. 2022). *Patel*, too, was a UDJA case that rejected sovereign immunity for state licensing officials. 469 S.W.3d at 77. So the UDJA's immunity waiver extends to official-capacity defendants.

## B. There Are No "Basic Pleading Defects"

Because the UDJA waives immunity for prospective constitutional claims, Plaintiffs' claims proceed to discovery unless there are "basic pleading defects." *Patel*, 469 S.W.3d at 77. "Basic pleading defects" means claims that are obviously defective on their face, not merely claims that a court might rule against. Some examples—according to *Defendants'* cases—include "merely label[ing] a cause of action and assert[ing] the existence of a constitutional violation," *Eriksen v. Nelson*, 708 S.W.3d 302, 308 (Tex. App.—15th Dist. 2025, no pet.); bringing claims that are "conclusively negate[d]" by "directly adverse," "dispositive" precedent, *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 16–17 (Tex. 2015); and bringing claims that will in "factual certainty" lead to "absurd results," *MALC*, 647 S.W.3d at 703. Or when "the Constitution expressly contemplates [and rejects] the very action that forms the basis of [a] complaint." *RW Trophy Ranch*, 712 S.W.3d at 962. By contrast (again from one of Defendants' cases), a claim based on a few sentences from two non-dispositive Texas Supreme Court cases is "more than sufficient to survive a sovereign-immunity challenge at th[e]" pleading stage. *MALC*, 647 S.W.3d at 700. Finding jurisdiction does not mean the legal theory is correct, just that sovereign immunity does not apply. *Id.* at 699 ("The ultimate merits determination

14

remains open for additional proceedings on remand[.]"); *id.* at 700 n.9 (explaining that "address[ing] only whether the claims are barred by sovereign immunity" is not resolving the meaning of a constitutional clause). *See also Tex. Dep't of Ins. v. Tex. Ass'n of Health Plans*, 598 S.W.3d 417, 426 (Tex. App.—Austin 2020, no pet.) ("[E]ven if" a merits analysis "were to weigh in favor of concluding that [challenged] statutes as written are constitutional, this would not make [a plaintiff's] constitutional UDJA claim unviable in our jurisdictional inquiry[.]"). Claims need only be "properly pleaded in order to be maintained, *not . . .* viable on their merits to negate immunity." *Patel*, 469 S.W.3d at 77 (emphasis added). The Court could resolve 99% of this appeal up front because Defendants do not identify any kind of *basic* pleading defect that would negate the UDJA's waiver of immunity.[7]

Defendants' tack, instead, is to argue that "the pleading bar" is not "that low;" that the standard is whether Plaintiffs' claims are "facially invalid." Appellants' Br. 10. Defendants, however, never explain what their standard means, or how, with citations, it operates in practice, or how "facially invalid" is any different from "containing basic pleading defects." (The cases use both phrases, and the obvious inference is that they mean the same thing: if a

---

[7] The only thing left would be whether the official-capacity defendants should stay in the caption.

claim contains an error as glaring as those discussed above, sovereign immunity kicks back in, and the court lacks jurisdiction. If not, not.) The entirety of their argument is limited to a single four-sentence paragraph with bare, unexplained citations. *Id.* at 10. The rest of Defendants' brief just suggests that "facial invalidity" means some kind of significant merits inquiry in which the reviewing court preemptively decides disputed questions of law to determine whether there is jurisdiction to review the pleadings. That would be contrary to case law, *see MALC*, 647 S.W.3d at 698, 700. It would neuter *Patel*'s clear statement that challenges to licensing restrictions "will in most instances require the reviewing court to consider the entire record, including evidence offered by the parties." 469 S.W.3d at 87. And it would render pointless the recent creation of the Rule 91a Motion to Dismiss, at least as applied to the government, because the state would never invoke a standard requiring that claims "be foreclosed as a matter of law in order to merit dismissal," *Davis v. Homeowners of Am. Ins. Co.*, 700 S.W.3d 837, 842 (Tex. App.—Dallas 2023, no pet.) (citation omitted), when it could smuggle merits review into the pleading stage under the guise of "jurisdiction." So first and foremost, the Court should simply clarify that the claims here proceed because they are not conclusory or "absurd" or foreclosed by "dispositive" law.

Ultimately, however, Defendants' standard, whatever it is, would not make a difference. As discussed below, Plaintiffs claims are "valid" as a matter of law under any pleading-stage understanding of that word. Even if the Court conducts some kind of review analogous to that under *federal* Rule 12(b)(6), Plaintiffs' claims easily survive dismissal.

## II. Plaintiffs Properly Pleaded A Substantive Due-Course-of-Law Claim

Plaintiffs' Article I, Section 19 substantive due-course-of-law claim proceeds if properly pleaded. That requires alleging (1) "a liberty or property interest that is entitled to constitutional protection," *Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 61 (Tex. 2018), and (2) a failure by "the government defendant [to] follow due course of law in depriving the plaintiff of that interest[,]" *Tex. S. Univ. v. Villarreal*, 620 S.W.3d 899, 905 (Tex. 2021). Plaintiffs satisfied both requirements. As in *Patel*, Plaintiffs have pleaded that the Ban violates their "right to earn an honest living in the occupation of one's choice free from unreasonable governmental interference." *Patel*, 469 S.W.3d at 74 (cleaned up). *See also* CR.189, 215. Defendants acknowledge that this is the same liberty interest at issue "in *Patel*." Appellants' Br. 15. And Plaintiffs have alleged that the Ban deprives them of that liberty interest without due course of law because the Ban's "purpose" is not "arguably . . . rationally related to a legitimate governmental

17

interest" and "when considered as a whole, the statute's actual, real-world effect as applied to" Plaintiffs is "so burdensome as to be oppressive in light of" that interest." *Patel*, 469 S.W.3d at 87. *See* CR.189, 208, 217. Simply, Plaintiffs pleaded a *Patel* claim and, as in *Patel*, it is "viable" enough to proceed to discovery.

Defendants have two responses: that the Court should not apply *Patel* at all and that the Ban, even on the pleadings, meets the test from *Patel*. As explained in Section I-B above, these arguments are premature. If the Court does reach them, however, both arguments are wrong. Moreover, challenges to criminal history bans regularly succeed in other jurisdictions.

## A. Plaintiffs Properly Pleaded A Liberty Interest

Defendants first ask the Court not to apply *Patel* because, they claim, *Patel* only "assumed" that Section 19 protects Texans' liberty interest in pursuing a common occupation. Appellants' Br. 15. That's incorrect. And even if it were right, history shows that Section 19 does protect that interest.

### 1. Plaintiffs' Liberty Interest Is Viable Under *Patel*

To start, the idea *Patel* assumed without deciding a crucial step in its analysis is hard to square with *Patel* itself. Many cases "assume without deciding" some point or another because it makes the analysis easier. *Patel* has no explicit reservation like that. Instead, the Justices spent 74 pages on

a majority opinion, two concurrences, and two dissents laying out the contours of how due-course-of-law challenges work in the context of the right to earn a living. Justice Willett's concurrence alone has 220 footnotes. *Patel* itself would be bizarre if it put all this effort into explicating and then debating about claims that don't exist. And the rule of party presentation does have limits: as a matter of jurisdiction, the *Patel* Court *could not* assume that the plaintiffs pleaded a valid liberty interest establishing jurisdiction. Even if the parties didn't raise the issue, the court would have been required to take it up *sua sponte. See Rosenberg Dev. Co. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 743 (Tex. 2019) (When parties make "assum[ptions]" regarding "immunity from suit—a matter implicating subject-matter jurisdiction," courts "consider[] *sua sponte*" whether immunity exists."). The much simpler reading is just that *Patel* took for granted the easy point that the Due Course of Law Clause protects the right to pursue a common occupation because that point was settled in Texas law. Only *how* the Clause protected it was still disputed.

The *Court*'s only statement about *Patel* merely assumed assuming the extent of Section 19's protections is dicta in a short footnote in *Crown Distributing. Tex. Dep't of State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 653 n.16 (Tex. 2022). *Crown Distributing* didn't rebut any of

19

the extensive historical record in *Patel*, nor did it even argue that Section 19 does *not* protect the right to work in a lawful occupation. The extent of what it said is that there is an open question. All that case *held* is that Section 19 does not protect working in *illegal* occupations "long deemed inherently vicious and harmful" because those occupations are not "common." *Id.* at 655 (cleaned up).

At the risk of stating the obvious, *Crown Distributing* cannot possibly mean there is a "basic pleading defect." On the one hand, there is *Patel*, in which the nine Justices debated across five opinions, and a majority of the Court held that plaintiffs challenging a licensing restriction as a violation of their right to engage in a lawful occupation *succeeded* on a Due Course of Law claim. Defendants respond with one dictum from one footnote suggesting that the entire *Patel* opinion was a mistake. (But only maybe.) That is nowhere near enough to mean this Court lacks jurisdiction to consider a claim under *Patel*. The only instances where this Court has found a due-course claim "facially invalid" for lack of a protected interest were in *RW Trophy Ranch*, 712 S.W.3d 943, and *Young v. Texas Parks & Wildlife Department*, No. 15-24-00052-CV, 2025 WL 1200947 (Tex. App.—15th Dist. Apr. 24, 2025, no pet. h.). Both cases pleaded the same property interest—a right to breeder deer—that had been *explicitly rejected* in prior caselaw. *RW*

20

*Trophy Ranch*, 712 S.W.3d at 954–58; *Young*, 2025 WL 1200947 at *3. Defendants fall well short of that mark: neither *Crown* nor any other case has rejected the liberty interest that won in *Patel* and which forms the basis of Plaintiffs' claims here. Plaintiffs' liberty interest is properly pleaded.

**2. Plaintiffs' Liberty Interest Is Supported By History**

If the Court considers this idea anyway, Texas law and history amply establish what *Patel* treated as settled law: Texans have a protected liberty interest in pursuing a lawful occupation without unreasonable government interference. The meaning of Section 19—including its protection of "liberty"—was "fixed when it [wa]s adopted" in 1876. *Cox v. Robison*, 150 S.W. 1149, 1151 (Tex. 1912). And "[g]iven the temporal legal context, Section 19's substantive due course provisions undoubtedly were intended to bear at least some burden for protecting individual rights that the United States Supreme Court determined were not protected by the federal Constitution" in the *Slaughter-House Cases*. *Patel*, 469 S.W.3d at 87. What rights were those? At minimum, "the right [of people] to exercise their trade, the business to which they have been trained and on which they depend for the support of themselves and their families." *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 60 (1873). The "temporal legal context"—explored below—leaves little doubt that Section 19's protection of "liberty" was

21

understood to include the right to pursue a lawful occupation that *Slaughter-House* rejected. And Texas courts "continue to" recognize the state's "burden" to protect that right "today." *Patel*, 469 S.W.3d at 87.

### a. "Liberty" included the right to pursue a lawful occupation without unreasonable government interference

The original public meaning of the word "liberty" in Texas in 1876 encompassed the full array of ancient natural rights, including the right to pursue a lawful occupation. Contemporary dictionaries contained entries for "civil liberty," which express the meaning of "liberty" in Article I, Section 19: "The liberty of a member of society, being a man's natural liberty, so far restrained by human laws, (and no farther), as is necessary and expedient for the general advantage of the public," *Liberty*, 1 ALEXANDER M. BURRILL, A LAW DICTIONARY & GLOSSARY (2d ed. 1871) (referring readers to the entry for "civil liberty"); "Exemption from arbitrary interference with person, opinion, or property, on the part of government under which one lives," *Liberty*, WEBSTER'S INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE: BEING AN AUTHENTIC EDITION OF WEBSTER'S UNABRIDGED DICTIONARY, COMPRISING THE ISSUES OF 1864, 1879, AND 1884 (Noah Porter ed., reference history ed. 1907). *See also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 75 (2015) (Thomas, J., concurring) (stating that the "individual liberty" cherished by "the Framers" is "not liberty in the sense of freedom from all [physical]

22

constraint," but "liberty as described by Locke"). Learned uses of "liberty" in popular writings also included the right to pursue a lawful occupation. *See, e.g.*, *A New Political Platform*, GALVESTON DAILY NEWS, June 11, 1874, at 2 ("This right to personal liberty no man and no community of men has any legal power to interfere with. The right to pursue any honest calling, to change from one place to another, to live where and how one pleases, are but carollary [sic] to this incontestible [sic] right."); *Injustice of the Occupation Tax*, DENISON DAILY NEWS, May 19, 1876, at 2 ("Liberty and equality were bequeathed to every American citizen by our forefathers—liberty to follow any lawful occupation . . . .").

Cases of the era likewise defined liberty broadly and as including the right to pursue a lawful occupation. Both dissents in *Slaughter-House*, for example, invoke this meaning. Justice Bradley: "This right to choose one's calling is an essential part of that liberty which it is the object of government to protect." *Slaughter-House*, 83 U.S. at 116. Justice Field: "Although the court, in its opinion, refers to the increase in prices and deterioration in quality of commodities which necessarily result from the grant of monopolies, the main ground of the decision was their interference with the liberty of the subject to pursue for his maintenance and that of his family any

23

lawful trade or employment. This liberty is assumed to be the natural right of every Englishman." *Id.* at 104.

And cases following the 1876 ratification consistently found that "liberty" included the right to pursue a lawful occupation. *See, e.g.*, *Smith v. Decker*, 312 S.W.2d 632, 633 (Tex. 1958) (recognizing that the "right to earn a living" is a liberty and property right); *Dent v. West Virginia*, 129 U.S. 114, 121 (1889) (recognizing a liberty interest in a "lawful calling, business, or profession"); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (recognizing right to "engage in any of the common occupations of life"); *Greene v. McElroy*, 360 U.S. 474, 492 (1959) (right to engage in one's "chosen profession"). Thus, the term "liberty" in Article I, Section 19 also included the right to pursue a lawful occupation.

### b. Ordinary Texans in 1876 would have understood their new Constitution as protecting the right to pursue a lawful occupation without unreasonable government interference

And the ordinary public meaning of "liberty" matched the legal term of art. Ratification history reveals what surely comes as no surprise. Texans respected hard work, were hard working, and thought of hard work as a moral imperative with two facets: the duty to earn one's daily bread by honest, lawful effort; and the duty not to trammel upon another's economic liberty by resort to protectionist, oppressive, and unreasonable legislation.

Everywhere, the word "right" is used. Nowhere is the pursuit of a lawful occupation characterized as a benefaction bestowed or revoked at the whim of the legislature.

The "right to work hard for an honest living," DENISON DAILY HERALD, Dec. 22, 1878, at 5, was the cornerstone of Texas' Reconstruction era identity. When Provisional Governor Hamilton addressed Texas freedmen on their rights in 1865, he observed that the "right to labor for an honest living" is "all that freedom means" for any Texan:

> You are free—made so by a generous, good Government; but you must not think that freedom means more for you than it does for others. It means for you, that you have the right to labor for an honest living—the right to obey the great command of God to all men, to earn, in the sweat of their face, their daily bread; the right to work for yourselves and receive the full reward of your labor. This is all that freedom means for any people.

*Address to the Freedmen of Texas*, SEMI-WEEKLY STATE GAZETTE (Austin), Nov. 21, 1865, at 1. More than a right, even, Hamilton recognized the moral "duty" of the freedmen to "employ [themselves] in useful labor for [their] own support," for "[n]o man is a good citizen, who does not earn a living in some honest way." *Id.* And in return for the freedmen discharging this moral duty—a duty common to all Texans—Hamilton promised them that their

"rights w[ould] be protected by the laws of the country" in the same manner as the rights of all Texans. *Id.*

The ratifying voters of the 1876 Constitution—the people of Texas—understood that. As one Texan put it plainly, the "right to work hard for an honest living is inherited by all." DENISON DAILY HERALD, Dec. 22, 1878, at 5. Additional pronouncements abound:

- "Every man has a right to follow any honorable occupation to make a living. This is an inherent right, one which no legislative body can give or take away." FORT WORTH STANDARD, July 8, 1875, at 1.

- "[E]very man has the natural right to choose such profession or occupation as is best suited to his taste or capacity . . . it is the duty of the State to protect all her citizens alike in the pursuit and enjoyment of all lawful occupations . . . ." *The Occupation Tax*, GALVESTON DAILY NEWS, May 18, 1876, at 4.

- "[T]he true spirit of [the government of our fathers] is to give protection to life, liberty, and property, and leave every man free to make or mar his own fortune, with as few restraints on his personal liberty as are compatible with the general good of society." *Whither Are We Drifting?*, DAILY DEMOCRAT (Fort Worth), Aug. 15, 1877, at 2

- "The worker is a free agent, and is at liberty to engage in any lawful calling by which he can gain a livelihood, and no one can prevent him, and into which no one can coerce him." *Wedlock of Labor and Capital*, GALVESTON DAILY NEWS, Jan. 19, 1879, at 2.

- "It is not possible to think of a more damnable act of tyranny than that which denies to a free man the right to work for an honest living . . . ." *Current Comment*, EVENING TRIBUNE (Galveston), Apr. 29, 1886, at 1.

Judges likewise recognized the right to earn an honest living in lawful occupations. A few months before the delegates assembled in Austin, a

Galveston judge struck down an ordinance prohibiting anyone except the "city Lumber Inspector" from inspecting lumber. *See Lumber Inspection*, GALVESTON DAILY NEWS, Apr. 9, 1875, at 4 (reporting the case of *City of Galveston v. Gonzalez*). After determining that the ordinance was *ultra vires*, the judge added that "any law which unnecessarily and oppressively restrains a citizen from engaging in any traffic or trade, following or calling, legitimate and lawful, is void, even though passed under the specious pretext of a public regulation." *Id.* (paraphrasing *State v. Fisher*, 52 Mo. 174, 177 (1873)). Accordingly, the lumber-inspection law was "unconstitutional, as it unnecessarily and oppressively restrain[ed] a citizen from exercising a legitimate and lawful calling or trade." *Id.*

State officials also recognized the right to pursue a lawful occupation. As the Constitutional Convention was meeting down the street, Attorney General George Clark recognized a Texan's "common right . . . of pursuing his own pleasure and profit in any manner he deems fit, conforming only to the laws of society and the rights of others." Tex. Att'y Gen. Op. No. 3438 (To Seller of Brandy Fruits, Aug. 24, 1875), TEX. STATE LIBR. AND ARCHIVES COMM'N, Box 2006/216-1 [https://perma.cc/KZ2L-C8Z3].

Accordingly, laws "in derogation of [this] common right," like occupation taxes, had to be strictly construed. *Id.* Only a few years later,

27

W.W. Lang, the head of the State Grange—an influential force at the Constitutional Convention—recognized the "right" of "every man . . . to pursue his lawful calling in his own way and to enjoy the fruits of his own labor." Hon. W.W. Lang, *Definition of His Attitude in State Politics*, DALLAS DAILY HERALD, May 15, 1880, at 2. And in 1889, Governor Ross, who had been a delegate to the Convention, stated that "[i]f there be any right in this country you should protect, it is the right of labor," for the "people are in favor of having and enjoying all the right they are justly entitled to." *Railways*, JACKSBORO GAZETTE, Jan. 17, 1889, at 2.

Defendants (at 18–20) wade into this early history largely to suggest that Section 19 *might* apply differently to health care workers. This argument fails for two reasons. The first is that social workers were not regulated at all circa 1876 or for 100 years thereafter, despite existing since the late 1800s. If history is what matters, it suggests that Plaintiffs *cannot* be prohibited from practice. The second reason is that historical regulation (of doctors) in no way implies that health care professions are *unprotected* under Section 19. It just means that the state *can* regulate certain health care professionals, so long as it abides by *Patel*.

28

*　*　*

No Texan in 1876 would have doubted that the "liberty" protected by their new constitution included the right to pursue a lawful occupation without unreasonable government interference. As *Patel* recognized, the meaning hasn't changed. *See Patel*, 469 S.W.3d at 87. Defendants—joining dissenters from *Patel*—worry that this "broad construction" of Section 19's protections would "raise the '*Lochner* monster.'" Appellants Br. 17 (quoting *Patel,* 469 S.W.3d at 138 *(*Hecht, C.J., dissenting)). But the high court hasn't adopted that dissenting view. Defendants' arguments here—as elsewhere—treat dissents and dicta as controlling, while ignoring the binding precedent and weight of history that support Plaintiffs' claims. It may be that the Texas Supreme Court will delve more into Section 19's history in the future. But until then—particularly at the pleading stage—that precedent is more than sufficient.

## B. Plaintiffs Have A Viable Claim That The Ban Fails *Patel*

Plaintiffs' claims are completely viable under *Patel*, which holds that challenges to "economic regulation statute[s] under Section 19," *Patel*, 469 S.W.3d at 87, receive "rational basis with bite." *Id.* at 98 (Willett, Lehrmann, and Devine, JJ., concurring) (describing test applied by the majority). Plaintiffs plead valid claims when they allege that either: (1) the

29

purpose of a regulation is not arguably rationally related to a legitimate government interest or (2) the real-world effect either is not arguably rationally related to the government interest or is so burdensome as to be oppressive in light of that interest. *Id.* at 87. Here, Plaintiffs pleaded both. CR.207–08, 211, 216–17. These verified allegations are sufficient to state a claim that the Ban violates Article I, Section 19.

**1. Plaintiffs Alleged The Ban Fails The "Purpose" Test**

The Ban's purpose is not arguably rationally related to a legitimate government interest. Defendants assert that the state interest at stake is "the health and safety of individuals within Texas." Appellants' Br. 26. While that is a legitimate interest in the abstract, the purpose of the Ban—barring people who would otherwise pass discretionary review—is not rationally related to it. Plaintiffs' verified allegations show the disconnect:

- "[T]here is no evidence that the Lifetime Licensing Ban protects the public from bad or dangerous social workers." CR.206.

- Independent of the Ban, "the state has the power to conduct an individualized determination for social work applicants and deny licenses to people whose criminal records mean they should not be social workers." CR.207.

- "[T]here is no evidence that the existing individualized determination procedure was insufficient to accomplish any legitimate government interest." CR.206.

- "Social work does not provide unique opportunities to commit crimes," particularly as compared with occupations that can be "legally

30

performed without a social work license" and without complying with the Ban. CR.208.

- The Ban "ignores that recidivism decreases as time elapses after a conviction" and "it takes only a few years after the end of a criminal sentence for the chance that someone will reoffend to decrease to the risk level that people *without* criminal convictions have of offending for the first time." CR.210.

- "[P]eople over the age of 50 without recent criminal records present no meaningful risk of offending" CR.210.

- "People who have overcome substance addiction and other forms of adversity are often uniquely qualified to help others beat similar challenges because of their first-hand experience." CR.211.

On these facts—which discovery will establish—the Ban was a solution in search of a problem. Other provisions of Texas law already completely served Defendants' interest in protecting the public. CR.217. Not only do those provisions of law *better* serve that government interest, but any benefit that the Ban could have is redundant because the government had already accomplished its goal. CR.217. Defendants' own mystified reaction to the Ban's passing backs that up. *See supra* at 5–6. Anyone with a criminal conviction covered by the Ban could have been denied a social work license by the Board, regardless of the Ban, if they were unfit to practice. CR.190. But because the Ban does not provide for individualized determinations of fitness to practice social work, people with convictions covered by the Ban who nonetheless *are* fit to practice are excluded. The Ban's only effect is to

31

exclude otherwise-qualified aspiring social workers—like Plaintiffs—who are barred by their criminal history, and the legislature does not have a legitimate government interest in excluding social workers fit to practice. CR.190. Nor does the legislature have a legitimate government interest in solving nonexistent problems, and a law that provides no actual benefit to the public is not rationally related to any legitimate government interest. *See Patel*, 469 S.W.3d at 87.

**2. Plaintiffs Alleged The Ban Fails The "Real-World Effect" Test**

Similarly, the Ban's actual, real-world effect as applied to Plaintiffs is not arguably rationally related to any legitimate governmental interest, and is so burdensome as to be oppressive in light of that interest. CR.208, 217. *See Patel*, 469 S.W.3d at 87. Even if the Ban were rationally related to protecting the public in the abstract, the actual, real-world effect of the ban is not. Again, Plaintiffs' verified allegations establish this, and Plaintiffs are prepared to prove it. In addition to the facts alleged above:

- "Katherin and Tammy remain fully qualified to be social workers" and "[a]llowing Katherin and Tammy to work as social workers would not pose any risk to the public," but "would benefit the public." CR.212.

- "The Lifetime Licensing Ban's basis for excluding Katherin and Tammy from social work licensure is not rationally related to either of their fitness for that work." CR.211.

32

- The Ban's "actual, real-world effect is to permanently deprive social workers from the license that they need to work in their chosen occupation." CR.207.

- "[T]he Lifetime Licensing Ban's application to Tammy and Katherin worsens mental health and substance abuse problems in Texas by limiting the supply of qualified social workers." CR.206.

- "[S]ocial work provides no unique opportunities to commit crimes beyond occupations that Katherin and Tammy can and have legally performed without a social work license, including occupations that involve one-on-one contact with clients, visiting clients' homes, and dealing with violent episodes from clients." CR.208.

- "People with criminal convictions who, like Katherin and Tammy, have taken all the steps to work as social workers are not more likely to commit crimes as social workers than in other positions." CR.208.

- "Tammy's conviction for an assault in 2006 and Katherin's conviction for an assault in 2007 do not make them any more likely than someone without prior assault convictions to commit crimes today." CR.210.

- "Katherin and Tammy . . . could easily have pleaded to different specific charges and not be banned, despite committing the same criminal conduct." CR.211.

- "The Lifetime Licensing Ban . . . excludes many people like Katherin and Tammy who are well-suited to work as social workers." CR.211.

These are the same kinds of facts that led the *Patel* court to strike down a threading licensing law even though it acknowledged threading "raised public health concerns" that might justify some lesser amount of training. *Patel*, 469 S.W.3d at 89. At the pleading stage, these verified allegations are more than enough to plead a substantive due-course-of-law claim.

It may be that the "dividing line is not bright" between the specific restrictions that "would yield a harsh, but constitutionally acceptable, requirement and [those] that would not." *Patel*, 469 S.W.3d at 90. Plaintiffs acknowledge that some restrictions on applicants with criminal records—such as individualized determinations under § 53.023—are likely constitutional. Licensing authorities can and do distinguish between people like Plaintiffs and people unfit to practice social work, and the state has the power *independent* of the Ban to "deny licenses to people whose criminal records mean they should not be social workers." CR.207. But Plaintiffs' convictions from the 2000s "do not make them any more likely than someone without prior assault convictions to commit crimes today" and Plaintiffs would "present no unique risk to the public if allowed to obtain social work licenses." CR.210.

### 3. Defendants' Counterarguments Are Wrong

**a.** Defendants' supposed off-ramps from *Patel* go nowhere. First, Defendants suggest that *Patel* is inapplicable because social work is not a "traditionally unregulated field," "health care" having "always been regulated." Appellants' Br. 24. But that doesn't line up with even the facts in Defendants' own brief. Again, though social work began in the 1800s, social work, "[u]nlike [other] health care professions," was unregulated until the

34

1980s, post-dating similar regulations for physicians by more than a century. *Id.* at 19–20. Even if social work regulations had the same tenure as those for physicians, it's hard to see how Plaintiffs' claims would be "facially invalid." The most Defendants offer on that point is single sentence in which when the Texas Supreme Court suggested that *Patel might* not apply to doctors. *State v. Loe*, 692 S.W.3d 215, 236 (Tex. 2024).[8] Defendants' *only* case for their "traditionally regulated field" rewrite of *Patel* is an unpublished Third Court case about lawyer licensing that nowhere mentions *Patel*. Appellants' Br. 26 (citing *Rivera v. Sonnenschein*, No. 03-21-00516-CV, 2022 WL 1751685, at *3 (Tex. App.—Austin June 1, 2022, pet. denied)). To the extent *Sonnenschein* conflicts with *Patel*, *Patel* controls. But *Sonnenschein* doesn't even apply—its holding concerns whether a liberty interest *exists* to challenge a requirement that aspiring lawyers have a degree from an accredited law school, not what test to apply when (as here) there's a protected right at stake.

---

[8] *Loe* goes on to hold that a restriction on providing a specific medical treatment does not prohibit the practice of a profession, so the test from *Patel* does not apply to bans on treatment. Exclusion from licensure itself, the problem here and in *Patel*, *does* prohibit working in a field.

Defendants' invocation of *Loe* is good example of their broader strategy to lead this Court away from the binding decision in *Patel* through a sentence here and there in later opinions. That is just not how precedent works. *Loe* did *not* decide that *Patel* is inapplicable to doctors. A one-sentence non-decision means nothing about what professions benefit from *Patel*.

Nor do Defendants have a good answer for how *Patel itself* could have come out the way it did if its test doesn't apply—as they claim—to any field where "[m]ost individuals are unable to perform" the job "because they lack the requisite education and training." Appellants' Br. 26. Nearly *all* jobs could be described that way, including the *Patel* plaintiffs' threading. And contrary to Defendants' implication, nothing in *Patel* limits its holding to claims that "question the amount of training and education required" for a license. Appellants' Br. 25. Defendants cannot cabin a Supreme Court case to its exact facts by fiat.

**b.** Even when Defendants purport to apply *Patel*'s test, their arguments ignore it. Under *Patel*, the burden of the law's real-world effect is determined "as applied to the challenging party." 469 S.W.3d at 87. So it's true that "Plaintiffs largely base their argument regarding the statute's real-world effect on their personal circumstances." Appellants' Br. 33. That's what *Patel* requires, even if Defendants would prefer to show only that the Ban "is rational as applied to" social workers broadly. Even if the wisdom of *Patel*'s test were up for debate, Defendants' *reductio ad absurdum* arguments against the test miss the mark. It's simply wrong that, under *Patel*, "age limits on participants in the alcoholic-beverage industry" would fall because they "are burdensome for those who are young." The test is not whether the effect

36

is—as Defendants claim—merely "oppressive" or "burdensome," but whether the law is burdensome "*in light of*[] *the governmental interest.*" *Patel*, 469 S.W.3d at 87 (emphasis added). *Patel* simply requires courts to look at the evidence and determine whether the governmental interest behind a law justifies the burden that law places on citizens. And Plaintiffs have viable claims that the Ban fails that test.

### C. Claims Like Plaintiffs' Have Succeeded In Other Jurisdictions Less Protective Of Economic Liberty

Not only does *Patel* confirm that Plaintiffs are bringing a recognized cause of action in Texas, many cases from around the country confirm that Plaintiffs' claim is viable at the pleading stage (and—down the road—likely a winning one). Courts have repeatedly struck down laws similar to the Ban, including under the *federal* rational-basis test, which is explicitly weaker than the test provided by *Patel*. *Patel*, 469 S.W.3d at 100 (Willett, Lehrmann, and Devine, JJ., concurring) ("The test adopted today bears a passing resemblance to 'rational basis'-type wording, but this test is rational basis with bite, demanding actual *rationality,* scrutinizing the law's actual *basis,* and applying an actual *test.*"). State high courts, federal district courts, and even the Seventh Circuit have all struck down criminal-history-based bans *on the merits*—including for health care, childcare, school workers, and other

37

potentially sensitive fields and including when the plaintiff was convicted of assault. That has included bans on:

- Taxi driving, *Miller v. Carter,* 547 F.2d 1314 (7th Cir. 1977) (per curiam), *aff'd*, 434 U.S. 356 (1978) (armed robbery and other crimes);

- Providing childcare, *Fields v. Dep't of Early Learning*, 434 P.3d 999 (Wash. 2019) (attempted robbery);

- Bail-bond work, *Chunn v. State ex rel. Miss. Dep't of Ins.*, 156 So. 3d 884 (Miss. 2015) (any felony);

- Substance abuse counseling, *Brown v. Smith*, 2024 WL 2819224 (E.D. Va. June 3, 2024) (robbery);

- Trading precious metals, *Barletta v. Rilling*, 973 F. Supp. 2d 132 (D. Conn. 2013) (any felony);

- Civil-service employment, *Furst v. N.Y.C. Transit Auth.*, 631 F. Supp. 1331 (E.D.N.Y. 1986) (any felony); *Kindem v. City of Alameda*, 502 F. Supp. 1108 (N.D. Cal. 1980) (any felony); *Butts v. Nichols*, 381 F. Supp. 573 (S.D. Iowa 1974) (any felony);

- Being a private detective or security guard, *Smith v. Fussenich*, 440 F. Supp. 1077 (D. Conn. 1977) (any felony);

- Public wrecker contracting, *Lewis v. Ala. Dep't of Pub. Safety*, 831 F. Supp. 824 (M.D. Ala. 1993) (misdemeanors of moral turpitude); *Gregg*

*v. Lawson*, 732 F. Supp. 849 (E.D. Tenn. 1989) (any felony) (denying motion to dismiss);

- Health and human services jobs with unsupervised client contact, *Cronin v. O'Leary*, 2001 WL 919969 (Mass. Super. Ct. Aug. 9, 2001) (manslaughter and armed robbery);

- Massage, *Pentco, Inc. v. Moody*, 474 F. Supp. 1001 (S.D. Ohio 1978) (any two felonies within five years or any sex crime within five years);

- Eldercare, *Nixon v. Commonwealth*, 839 A.2d 277 (Pa. 2003) (various crimes including armed robbery); *Peake v. Commonwealth*, 132 A.3d 506 (Pa. Commw. Ct. 2015) (en banc) (various crimes including assault);

- Working as a school counselor, *Johnson v. Allegheny Intermediate Unit*, 59 A.3d 10 (Pa. Commw. Ct. 2012) (en banc) (felony homicide);

- Providing child-protective services, *Warren Cnty. Hum. Servs. v. State Civ. Serv. Comm'n,* 844 A.2d 70 (Pa. Commw. Ct. 2004) (aggravated assault);

- Selling cars, *Brewer v. Dep't of Motor Vehicles*, 93 Cal. App. 3d 358 (1979) (crimes of moral turpitude);

- Bookselling, *Perrine v. Mun. Ct.*, 488 P.2d 648 (Cal. 1971) (certain sexual and violent crimes);

- Cosmetology, *Tanner v. De Sapio*, 150 N.Y.S.2d 640 (N.Y. Sup. Ct. 1956) (grand larceny); *Haveman v. Bureau of Prof. & Occupational Affairs*, 238 A.3d 567 (Pa. Commw. Ct. 2020) (en banc) (various crimes of moral turpitude, including assault);

- Working as a radiology technician, *Shimose v. Haw. Health Sys. Corp.*, 345 P.3d 145 (Haw. 2015) (drug possession with intent) (statutory ruling denying motion for summary judgment); and

- Operating a cigarette wholesaler, *Sec'y of Revenue v. John's Vending Corp.*, 309 A.2d 358 (Pa. 1973) (crimes of moral turpitude) (statutory ruling).

In nearly all these cases, the plaintiffs won outright. The bans violated constitutional guarantees of rationality under due process, equal protection, or both.

Consider *Chunn*, 156 So. 3d 884. There, Mississippi prohibited people with any felony conviction from working as bail-bond agents. The court did not decide whether "the State has a legitimate interest in prohibiting *some* felons from engaging in this profession" because it didn't need to. *Id.* at 886. Rather, the court found the ban unconstitutional *as applied* to someone with only a thirty-three-year-old felony conviction for drug possession. *Id.* The state offered about as much justification as

40

Defendants do here—it can protect an "important" profession from someone convicted of a felony, *id.*—but the Supreme Court of Mississippi held that justification too weak under even the *federal* rational-basis test. "A person's God-given, constitutional liberty to engage in a profession," the court explained, "should not so easily be extinguished by the government." *Id.* at 889. "Because the statute fail[ed] to account for the differences in particular felonies and the relationship between particular felonies and fitness to hold a bail-agent license; and because it ha[d] no time limits for when the felony was committed, [the court] conclude[d] that the statute" failed rational basis review. *Id.*

Or take *Barletta*, where a plaintiff won a challenge to the constitutionality of a Connecticut statute prohibiting convicted felons from holding a license to deal precious metals. *Barletta*, 973 F. Supp. 2d 132. Barletta had held a license previously then, three years after it expired, spent three years in prison for felony narcotics distribution. *Id.* at 135. Only four years after his conviction he applied for a new license and was denied because of his felony. *Id.* But a federal court entered judgment for him because it found that the statute was "irrational because the ban on felons is insufficiently related to the purpose of the statute." *Id.* at 139. "To deny job opportunities to these individuals because of some conduct which may be

remote in time or does not significantly bear upon the particular job requirements is an unnecessarily harsh and unjust burden." *Id.* at 139–40 (quoting *Green v. Mo. Pac. R.R.*, 523 F.2d 1290, 1298 (8th Cir. 1975)).

In *Chunn*, *Barletta*, and other cases listed above, courts have repeatedly determined that blanket licensing bans for criminal history that ignore an applicant's individualized circumstances fail even the most government-friendly varieties of constitutional review. And Article I, Section 19 of the Texas Constitution—steeped in respect for economic liberty—"demand[s]" an even higher threshold. *Patel*, 469 S.W.3d at 100 (Willett, Lehrmann, and Devine, JJ., concurring). If plaintiffs can *win* cases challenging laws just like the Ban without Section 19's "bite," it certainly means Plaintiffs' Section 19 claim against the Ban can at least survive a plea to the jurisdiction. Plaintiffs' substantive due-course-of-law claim is not "foreclosed" or suffering a basic "defect." To the contrary, Plaintiffs' verified allegations track with those that won on the merits in *Patel* and in other jurisdictions.

## III. Plaintiffs Properly Pleaded A Procedural Due-Course-of-Law Claim

### A. Plaintiffs' Procedural Claim Is Recognized In Texas

Plaintiffs have also properly pleaded a procedural due-course-of-law claim under Article I, Section 19. CR.215–18. *See Univ. of Tex. Med. Sch. at*

*Hous. v. Than*, 901 S.W.2d 926, 929–30 (Tex. 1995) (standard for reviewing procedural due process under Tex. Const. art. I, § 19 "follow[s] contemporary federal due process interpretations of procedural due process issues"); *accord Mosley v. Tex. Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 264–65 (Tex. 2019) (quoting *Than*). Plaintiffs have been permanently deprived of the right to earn an honest living in the occupation of their choice. CR.216. *See supra* Section II. Given the risk of constitutionally erroneous deprivation of that protected liberty interest, Article I, Section 19 requires that they first receive an opportunity to be heard in a meaningful manner by a neutral decisionmaker. *Than*, 901 S.W.2d at 930 ("Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." (citing *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976)). It's uncontested that the Ban provides no such opportunity for an individualized determination. CR.216; Appellants' Br. 1, 28–29. On those facts, Plaintiffs' procedural due-course claims are at least sufficiently viable to proceed past the pleading stage.

## B. Section 19 Requires Individualized Process For Individualized Deprivations Of Liberty

Defendants' chief argument that Plaintiffs' procedural due-course-of-law claim is "facially invalid" is that the legislature may deprive people of "life, liberty, or property" without individualized process because the

"legislative process" affords all the due process required. Appellants' Br. 36–37. That is plainly wrong, and it would render the procedural due-course clause a dead letter. Under that reading, *no* law could violate the procedural due-course clause, and the state would be free to deprive anyone of life, liberty, or property without notice or a hearing. Laws are not constitutional merely because they are laws. *See McFadden v. Longham*, 58 Tex. 579, 585 (1883) (holding that a statute "does not become a part of 'the law of the land' in virtue of its enactment" and lacks the "authority of law" if contrary to Section 19's protection of Texans' "right to be heard" before being deprived of their "life, liberty, property, [or] immunities").

Defendants' theory rests on a highly selective reading of *Matzen v. McLane*, 659 S.W.3d 381 (Tex. 2021). Contrary to Defendants' telling, *Matzen* makes it crystal clear that Texans *are* entitled to an individualized hearing when deprived of their rights. *Matzen* concerned a sexually violent predator who had been civilly committed following a "notice and hearing." *Id*. at 392. Later, the legislature tweaked certain aspects of the civil commitment program that affected the man (among others) without affording him a new hearing, so he sued. The court determined that the "legislative process" was sufficient for the tweaks—but only because the man's "due-process rights were adequately protected by the [original] notice

44

and hearing mandated by the Legislature." *Id.* The later change to the program directed at "a general class of persons" who had *already* received individualized process didn't require a new hearing. *Id.*

Defendants' explanation is that "an *adjudicative* process like an administrative hearing . . . requires notice and a meaningful opportunity to be heard," while no hearing is required "in a *legislative* context." Appellants' Br. 39. Not only does this boil down to a circular argument of "hearings require hearings," but it falls apart when applied to Katherin and Tammy's circumstances. Social work applicants—even under the Ban—*do* have "an adjudicative process like an administrative hearing" to determine whether they are issued a license. *See* 22 Tex. Admin. Code § 882.3. The Ban doesn't eliminate that process, it just eliminates access to that "meaningful opportunity to be heard" that the constitution requires by predetermining the outcome.

Outlawing an entire profession—like smokeable hemp in *Crown*—may be a "legislative process." But state officials denying licenses to Katherin and Tammy to practice a legal profession is no more a "legislative process" than a criminal is convicted by the "legislative process" behind the law he broke. When licensing authorities specifically deny an individual application because of the Ban, that denial is not directed at "a general class of persons."

45

An adjudicative process occurs, and it results in the denial of a specific applicant. As in *Matzen*, that individualized deprivation requires an individualized determination, at least when, as here, the risk of irrational deprivation is unacceptably high.

## C. Claims Like Plaintiffs' Routinely Succeed In Other Jurisdictions

Caselaw from other jurisdictions shows how laws like the Ban violate the procedural rights of people like Plaintiffs. And these cases routinely find that individualized determinations are required when states deny licenses based on overbroad criminal history bans. In *Fields*, for example, plaintiff Christal Fields had "attempted to snatch a purse to help pay for her drug habit" when she was 22, leading to her conviction for attempted robbery. *Fields v. Dep't of Early Learning*, 434 P.3d 999, 1001 (Wash. 2019) . Twenty-five years later, she had "turned her life around" and sought work at a childcare facility. *Id.* But a state agency informed her she wasn't qualified to work there and sent her a list of "50 types of permanently disqualifying convictions, one of which [was] '[r]obbery.'" *Id.* at 1001, 1003. The Washington Supreme Court struck down the law barring Fields from working and held that an "individualized determination of [Fields's] qualifications is required as a matter of procedural due process." *Id.* at 1007. The *Fields* court did not hold that the state could *never* disqualify someone

with one of the listed convictions. But there was likely no "rational basis for doing so" in "the particular circumstances presented by Fields's case" and a blanket ban that ignored those circumstances without a hearing was thus unconstitutional. *Id.* at 1004.

*Gregg v. Lawson* reached the same conclusion. 732 F. Supp. 849. In *Gregg*, a Tennessee federal court denied a motion to dismiss plaintiff Jim Gregg's due process and equal protection challenges to a state regulation that denied his wrecking company a place on a state wrecker list because Gregg was a convicted felon. 732 F. Supp. at 850–51, 854–56. The court allowed Gregg's claims to proceed even though Gregg had been convicted of felony aggravated assault *while* on the state list. *Id.* at 851. The court reasoned that the "blanket" nature of the ban and "inflexible rule that permitted no examination of the circumstances" violated due process. *Id.* at 854–55.[9]

In another case, a Massachusetts court held that the procedural guarantees in its state constitution required "individual hearings" to determine whether "individuals convicted of . . . manslaughter and armed robbery . . . pose so grave a danger and so high a risk of reoffense as to

---

[9] As to Gregg's equal protection claim, the court noted that "[i]f a regulation 'fails to recognize the obvious differences in the fitness and character of those persons with felony records' based on the differences in the nature of the crimes committed in relation to the person's fitness to engage in a particular occupation, then that regulation may violate equal protection." *Id.* at 856 (quoting *Smith v. Fussenich*, 440 F. Supp. 1077, 1080 (D. Conn. 1977)) (internal citations omitted).

warrant a lifetime mandatory conclusive presumption of dangerousness" that would exclude them from health and human services jobs. *Cronin*, 2001 WL 919969, at *7. The throughline is the same as in *Matzen*: individualized deprivations require individualized determinations. And Texas provided those determinations—until the Ban went into effect in 2019. CR.217. *See* Tex. Occ. Code § 53.023.

Plaintiffs' claims and verified allegations hew closely to the reasoning in *Fields*, *Gregg*, and *Cronin*: Given the risk of erroneous deprivation, Plaintiffs ask only for individualized determinations on whether their "particular circumstances" should exclude them from social work. *See* CR.217. That procedure allows licensing authorities to license fit applicants and to exclude those who pose a threat to public safety. *Id*. Flatly banning all applicants with convictions like Plaintiffs, without respect to individual circumstances, is not the process the state constitution requires. Plaintiffs have thus properly pleaded a procedural due-course-of-law claim challenging the Ban.

## IV. Plaintiffs Properly Pleaded An Equal Rights Claim

### A. Plaintiffs' Equal Rights Claim Is Recognized In Texas

Plaintiffs have also pleaded viable claims that the Ban violates the state constitution's guarantee of equal rights, Tex. Const. art. I, § 3. CR.218–20.

"[S]imilarly situated individuals must be treated equally under [a] statutory classification unless there is a rational basis for not doing so." *Stout v. Grand Prairie Indep. Sch. Dist.*, 733 S.W.2d 290, 295 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Though disparate treatment is not "subject to courtroom fact-finding," it still requires a rational basis and the "challenged classification" must "reasonably promote that purpose." *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015). Plaintiffs' verified allegations make clear that there is no rational basis behind any of the classifications regarding who the Ban does and does not apply to. None of the classifications promote a legitimate purpose, and so Plaintiffs have a viable equal rights claim under Article I, Section 3.

As Plaintiffs allege in their verified petition, the Ban treats them differently from other similarly situated people without any rational basis and in promotion of no legitimate purpose. CR.219–20. Social work, professional counseling, and marriage and family therapy are similar professions in all respects relevant to the Ban. CR.219. Plaintiffs are thus similarly situated to applicants for professional counseling and marriage and family therapy licenses with convictions that would be barred by the Ban were they to instead practice social work. CR.219. These are all professions that can involve one-on-one contact with clients—any government interest

49

regarding protecting the public would apply with equal strength to applicants with the same convictions as Plaintiffs applying for those other licenses not covered by the Ban. *See* CR.219–20. But the Ban irrationally discriminates between Plaintiffs and such applicants for other licenses and applies only to social work licenses. CR.219–20. Because the Ban doesn't apply to professional counselors or marriage and family therapists, applicants for those licenses with criminal histories receive individualized determinations. *See* Tex. Occ. Code §§ 108.052 (Ban applies to "health care professional[s]"), 108.051 ("[h]ealth care professional" excludes professional counselors and marriage and family therapists); Tex. Occ. Code § 53.021 (licensing authorities must conduct individualized determinations). So under Texas law, a violent felon can provide one-on-one therapy if they trained as a counselor, but not if they trained as a social worker.

In response, Defendants merely assert that "[t]he definition of the work done by each profession is different" and the "Legislature may choose to impose different requirements on different licenses." Appellants' Br. 45. They then speculate that the Legislature "may have been aware of practical reasons" to justify treating social workers differently from similar professions. But while the rational basis bar is low, the court does not lose

50

jurisdiction over Plaintiffs' claims based on mere speculation that there was a purpose for the discriminatory treatment.

## B. Claims Like Plaintiffs' Succeed In Other Jurisdictions

Plaintiffs' verified allegations concerning the Ban's oppressive application to Plaintiffs but not to similarly situated members of other professions echo laws struck down by courts in other jurisdictions for violating equal protection guarantees. *Gregg*[10] is such a case, but there are more.

Take *Haveman*, where the Pennsylvania Commonwealth Court struck down a "good moral character" requirement that applied to would-be cosmetologists with criminal histories but not would-be barbers. 238 A.3d 567 (Pa. Commw. Ct. 2020) (en banc). Like social workers and other types of counselors in Texas, barbers and cosmetologists had high "similarity in the services" they provided and the "setting" they worked in. *Id.* at 579. The court found there was "no set of circumstances under which the [good moral character requirement] would be valid" since "[s]imilarly situated licensed professionals and individuals in close contact with salon patrons and their belongings are not similarly restricted." *Id.*

---

[10] *See supra* at 47 n.9.

The services and setting for licensed social work are substantially similar to those of professional counseling, marriage and family therapy, and unlicensed case worker positions. CR.219. Like barbers and cosmetologists, social work entails the same level of "close contact" with clients as other forms of therapy. *See* CR.219. Yet only social workers are restricted by the Ban. And as Plaintiffs have alleged, they "are no more likely to commit crimes as social workers than as LPCs, LMFTs, case managers, or other positions at treatment facilities." CR.210.

Because Haveman—along with plaintiffs in cases like *Barletta* and *Chunn*—had viable claims, Plaintiffs do too. The *Barletta* plaintiff won outright, even under the federal rational-basis standard, even though his conviction was recent and occurred *after* receiving his state credentials. Plaintiffs' claims are stronger. Plaintiffs are barred from working based on convictions that occurred nearly two decades ago and years before they started even their undergraduate studies in social work. But like in *Gregg*, the Ban's "blanket" and "inflexible" nature fails to consider the "circumstances" of Plaintiffs' convictions or the "obvious differences" between Plaintiffs and other felons with crimes far more serious and more related to the practice of social work. 732 F. Supp. at 854–56. And like in *Barletta*, the Ban is "insufficiently related to the purpose of the statute," and

Plaintiffs' convictions do not "significantly bear upon the particular job requirements" of social workers. Like the law in *Barletta*, the Ban "is an unnecessarily harsh and unjust burden" and Plaintiffs have stated viable claims to challenge it. 973 F. Supp. 2d at 139–40.

* * *

Again, none of this sort of analysis is needed now. The petition is free from basic pleading defects, and that is enough. But if the Court does conduct the kind of review that Defendants suggest, the claims here are likely winning, and that is much more than is needed to proceed to discovery.

## PRAYER

For these reasons, the district court's judgment denying the plea to the jurisdiction should be affirmed.

Respectfully submitted,

Dated: August 7, 2025         /s/ James T. Knight II

Arif Panju
(TX Bar No. 24070380)
Institute for Justice
816 Congress Avenue, Suite 970
Austin, TX 78701
Tel.: (512) 480-5936
apanju@ij.org

James T. Knight II*
(D.C. Bar No. 1671382)
Andrew Ward*
(NY Bar No. 5364393)
Institute for Justice
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
jknight@ij.org
award@ij.org

*Counsel for Appellees*       *Admitted *pro hac vice*

53

**CERTIFICATE OF SERVICE**

I certify that on August 7, 2025, a true and correct copy of the foregoing Appellees' Response Brief was filed with the Clerk of Court and served in compliance with the Texas Rules of Appellate Procedure via the Court's electronic filing manager on all counsel of record.

/s/ James T. Knight II
James T. Knight II
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that the foregoing Appellees' Response Brief contains 11,748 words, excluding the portions of the brief exempted by Tex. R. App. 9.4(i)(1).

/s/ James T. Knight II
James T. Knight II
*Counsel for Plaintiffs-Appellees*

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Arif Panju on behalf of Arif Panju
Bar No. 24070380
apanju@ij.org
Envelope ID: 104114077
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Appellees' Response Brief Requesting Oral Argument
Status as of 8/7/2025 4:08 PM CST

Associated Case Party: Katherin Youniacutt and Tammy Thompson

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Arif Panju | 24070380 | apanju@ij.org | 8/7/2025 3:55:40 PM | NOT SENT |
| James T. Knight II | | jknight@ij.org | 8/7/2025 3:55:40 PM | NOT SENT |

Associated Case Party: Texas State Board of Social Workers Examiners, et al.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Ramsey | 24051227 | John.Ramsey@oag.texas.gov | 8/7/2025 3:55:40 PM | NOT SENT |
| Beth Klusmann | | beth.klusmann@oag.texas.gov | 8/7/2025 3:55:40 PM | NOT SENT |
| Ali Thorburn | 24125064 | ali.thorburn@oag.texas.gov | 8/7/2025 3:55:40 PM | NOT SENT |
| Eric Abels | | Eric.Abels@oag.texas.gov | 8/7/2025 3:55:40 PM | NOT SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 8/7/2025 3:55:40 PM | NOT SENT |
| Andrew Ward | | andrew.ward@ij.org | 8/7/2025 3:55:40 PM | NOT SENT |
| Ashlynn Acosta | | aacosta@ij.org | 8/7/2025 3:55:40 PM | NOT SENT |
| Claire Purple | | cpurple@ij.org | 8/7/2025 3:55:40 PM | NOT SENT |